**E. W. BLISS COMPANY, Plaintiff,**

v.

**STRUTHERS–DUNN, INC., P. G. Bartlett, L. K. Clark, D. E. Henry, and J. A. Dinges, Defendants.**

**Civ. No. 3–764–D.**

United States District Court
S. D. Iowa,
Davenport Division.

Sept. 18, 1968.

**392**

James H. Tilberry and Robert B. Sundheim, Cleveland, Ohio. Richard M. McMahon and Ralph D. Sauer, Davenport, Iowa. Isador I. Katz, Rock Island, Ill., for plaintiff.

Max Putnam, Des Moines, Iowa. Ellis Dickens, Davenport, Iowa. William D. Hall, Washington, D. C., for defendant.

## MEMORANDUM ON PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

### FINDINGS OF FACT

STEPHENSON, Chief Judge.

1. This matter is now before the Court upon plaintiff's application for a preliminary injunction during the pendency of this litigation.

2. Plaintiff, E. W. Bliss Company (hereinafter referred to as Bliss), is a Delaware Corporation having its principal place of business in Canton, Ohio. A division of Bliss, the Eagle Signal Division (hereinafter referred to as Eagle), is located in Davenport, Iowa. The defendant, Struthers-Dunn, Inc., is a Pennsylvania Corporation having its principal offices in Pitman, New Jersey and, through its Systems Division, is doing business in Bettendorf, Iowa. Defendants P. G. Bartlett, L. K. Clark and D. E. Henry (hereinafter referred to as Bartlett, Clark and Henry, respectively) are residents of the State of Iowa and defendant J. A. Dinges (hereinafter referred to as Dinges) is a resident of the State of Illinois. Each of the individual defendants was formerly employed by Eagle and is presently employed by Struthers-Dunn in the Systems Division of Bettendorf, Iowa. Bartlett is Manager of the Systems Division in Bettendorf, Iowa, Henry is Chief Engineer, Clark is Office Manager, and Dinges is Sales Manager.

3. The complaint in this cause, Civil Action No. 3–764–D, was filed in this Court on December 6, 1967. Prior to that date, on November 8, 1967, all of the defendants herein filed suit in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 44022, against the E. W. Bliss Company seeking a declaratory judgment that Eagle has no trade secrets and that Bartlett, Clark, Henry and Dinges were free to use all information acquired at Eagle without restriction, and injunctive relief. Defendants herein filed an amended complaint in Civil Action No. 44022 subsequent to December 7, 1967 alleging, *inter alia*, slander and an antitrust violation. On motion of Bliss, the Honorable Judge John T. Fullam of the United States District Court for the Eastern District of Pennsylvania, on December 22, 1967, transferred Civil Action No. 44022 to this Court pursuant to 28 U.S.C. § 1404(a).

4. The complaint in this cause, Civil Action No. 3–764–D, is for breach of contract, breach of fiduciary relationship and unfair competition. Bliss contends that the individual defendants, all of whom were previously employed by Eagle, had access to and knowledge of certain trade secrets and proprietary or confidential technical information of Eagle. The complaint further alleges that the individual defendants were each under a contractual obligation to maintain in confidence all secrets and proprietary information of Eagle but that, by virtue of and because of the employment of Bartlett, Clark, Henry and Dinges by defendant Struthers-Dunn, the trade se-

crets and confidential technical information of Bliss will be disclosed, all to the irreparable damage of Bliss. On motion of Bliss, and upon an ex parte hearing before the Court on December 7, 1967, a temporary restraining order was issued and a hearing on plaintiff's request for a preliminary injunction was set for December 15, 1967. The temporary restraining order was modified by an order dated December 19, 1967 and continued by stipulation of counsel until the full hearing on the request for preliminary injunction could be completed and a decision rendered. The order was further modified on June 25, 1968. The temporary restraining order now in effect is as follows:

"a. All defendants separately and jointly are restrained from using or disclosing trade secrets and confidential technical information of plaintiff to any person, firm or corporation.

b. Defendant Struthers-Dunn is restrained from employing defendants Bartlett, Clark, Henry and Dinges to engage in any work involving the alleged trade secrets of plaintiff Bliss as set out in its complaint herein.

c. Defendants are restrained from contacting or disclosing customers or proposed customers of the project involving a control system for the process machine designated MACHINE X.

d. Defendant Struthers-Dunn is restrained from maintaining within 500 miles of Davenport, Iowa a division or facility for designing, manufacturing or consulting in the field of solid state engineering involving the alleged trade secrets of the plaintiff Bliss as set out in its complaint herein.

e. Nothing herein shall prevent the defendant Struthers-Dunn from doing business to the same extent it was competent to do business prior to the hiring of the individual defendants Bartlett, Clark, Henry and Dinges."

5. Comprehensive hearings extending over several weeks have been held on the issue of a preliminary injunction with all parties presenting testimony of witnesses and introducing a large number of exhibits. Counsel for both parties joined in requesting that final hearing on plaintiff's request for a preliminary injunction be postponed until such time as a transcript of all of the testimony could be prepared and briefs filed. Pursuant to such request final oral hearing was held August 26–27, 1968.

6. There is no dispute as to jurisdiction and venue of Civil Action No. 3–764–D which are based upon Title 28, United States Code § 1332(a) (1) and § 1391. Diversity of citizenship is present and the value of the alleged trade secrets and proprietary information here at issue is alleged to be in excess of the requisite sum of $10,000, excluding interest and costs.

7. The technical subject matter involved in this proceeding relates to the field of solid state electronics. Some small amount of work in solid state electronics began as early as 1912; however, it was not until the development of the transistor at about 1948 that the solid state field began rapidly to expand. Since that time, giant strides have been made in the solid state field and there are a large number of companies and tens of thousands of electronics engineers working in diverse areas of solid state electronics. Some examples of these areas are computers, radio receivers and transmitters, television receivers, telemetering, telephone systems, antennas, and transistors. In addition to these areas, the field of solid state electronics includes the specific areas on which Eagle is doing development work, as identified in its complaint and Exhibit B attached to the complaint. Even within the areas in which Eagle is working, there are many specialized sub-areas within the broad areas. The field of solid state electronics is extremely complex with a tremendous number of solid state devices having been developed, most differing in some respects, one from another.

8. Eagle began business in 1922 as a supplier of police call boxes and fire alarm boxes. From this, Eagle progress-

ed to manufacturing and supplying mechanical traffic equipment and, through the depression years, further expanded its line to include industrial timers and components. Relays were subsequently added to the product line. Eagle's industrial timers and components are used in process control systems, and particularly systems associated with plastic molding machinery. Up until about 1958, the Eagle products were either of a mechanical or electro-mechanical construction. By 1958, Eagle had attained a firm position with its electro-mechanical devices in the process control field, primarily plastic molding machinery. In late 1958, Eagle recognized the desirability of converting its electro-mechanical products to solid state.

9. Since most of its people were trained in mechanical or electro-mechanical devices, Eagle began an active recruiting program to hire electronics engineers. In addition, Eagle instituted a program of summer employment for college students and conducted classes in solid state electronics for Eagle employees at the Eagle plant, all for the purpose of introducing solid state electronics to the product line of Eagle. Henry participated in the summer employment program of Eagle. In addition, Eagle financially assisted, Clark in paying for his college education through direct payments and summer employment.

10. Defendant Struthers-Dunn is a manufacturer of relays and timers. The products manufactured by Struthers-Dunn are essentially electro-mechanical in nature although Struthers-Dunn does have a time delay relay which employs a solid state timing circuit. However, the president of Struthers-Dunn has stated that the company was not experienced in solid state work (PX 62).[1] The Struthers-Dunn relays are sold for many purposes, one of which is in connection with controls for plastic molding machines. The solid state process control systems which Eagle now offers for plastic mold-

ing machines are designed to eliminate the need for electro-mechanical relays of the Struthers-Dunn type. It was for the purpose of gaining a capability in solid state systems that the individual defendants were hired by Struthers-Dunn. Struthers-Dunn was particularly interested in the individual defendants for their experience and knowledge in designing and building solid state process control systems, a field which would be directly competitive with Eagle. In fact, it has been brought to the attention of the Court by a motion filed subsequent to these hearings, that the Systems Division of Struthers-Dunn has developed a product, designated TP-1000, which is specifically designed as a control system for plastic molding machinery and has been offered to at least one company which is a customer of plaintiff.

11. Bartlett, Clark, Henry and Dinges have been exposed to certain areas of Eagle trade secrets which are enumerated in Paragraph 18(a) of the complaint and plaintiff's Exhibit B. The development of these trade secrets represents an out of pocket investment considerably in excess of $100,000. Ten different Eagle products are being developed which employ these trade secrets with total first years sales being forecast at $1.5 million.

12. The evidence indicates that Eagle is currently developing a split coil time delay relay. A substantial potential market for the relay is forecast and it is different from anything presently on the market. Eagle has not yet introduced this relay to the market and it is confidential with Eagle.

13. Eagle has developed a solid state step switch which employs binary information storage memory means including ferroelectric capacitors. The development of this device has extended over a period of two years. The step switch may be used for a wide range of applications including industrial process controls. There is no other comparable product on the market. Eagle has not yet placed this device on the market.

1. PX—plaintiff's Exhibit.

14. For many years, Eagle has been supplying electro-mechanical process controls for controlling industrial process machinery, such as plastic molding machines. Eagle has been a substantial leader in this field, particularly as to supplying electro-mechanical control systems to the plastic molding machine industry. This industry now wants solid state control circuits and there is a substantial market for such circuits. In the last few years, Eagle has been developing solid state circuits for this market and Henry has been the leader in charge of the development of the solid state process control circuits which Eagle proposes to supply to this industry. The first two solid state circuits which Eagle plans to introduce to this market will not be introduced until at least October, 1968. A third control system has also been developed at Eagle but there are no specific plans for its use.

It is this field of process controls in which Struthers-Dunn is also involved with its electro-mechanical relays.

15. Eagle has developed ferroelectric storage capacitors for storing binary information, sometimes referred to as ceramic memory devices. There are numerous Bliss patent applications on this subject (PX 33, PX 40, PX 41, PX 42, PX 43, PX 44, PX 45, PX 46, PX 47, PX 60). The first use planned by Eagle for the ceramic memory devices is in a solid state step switch which has not yet been placed on the market.

16. Eagle has developed a new non-linear solid state amplifier particularly applicable for driving a synchronous motor for traffic control. This amplifier has not been placed on the market and is different from anything on the market.

17. Eagle has developed a solid state traffic controller ET 600 as well as a solid state digital traffic controller incorporating ceramic memories, the latter being too sophisticated for the present market and has been placed aside for future markets. No publication or disclosures have been made regarding this digital controller, which is still confidential with Eagle. Eagle spent several months developing the ET 600. Although the first prototype was sold to the city of Cedar Rapids, Iowa, which has long served as a testing ground for Eagle's prototypes, there is no evidence that anyone, other than Eagle's engineers and Messrs. Bartlett, and Clark, has sufficient knowledge of the controller to understand and reproduce it. Although the defendants contend that a competitor has reportedly obtained photographs of certain unidentified portions of the ET 600, the device is so electronically complex that such photographs do not provide an adequate basis for understanding the design circuitry of this device.

18. Eagle has developed a device for converting binary coded decimal numbers to decimal numbers and which, in part, is described in a pending Bliss patent application (PX 48). This converter has not been marketed and is still confidential to Eagle.

19. As to manufacturing and testing techniques used by Eagle, the evidence establishes that a certain technique is used for testing traffic controllers. Also, Eagle has certain equipment (PX 15) for testing ceramic memory devices. These testing techniques and equipment are not known outside of Eagle.

20. Defendants Bartlett, Clark and Henry each have testified to certain patent applications which have been filed in their names. In addition, there are certain other patent applications involving inventions developed by these three men which either have been prepared or are awaiting preparation. Several of these patent applications have been submitted by Eagle's patent attorneys to Bartlett, Clark and Henry for the purpose of having the applications executed and assigned to Bliss; however, none of these applications has as yet been executed and Bliss has brought a motion for summary judgment on the issue of the contractual obligation of Bartlett, Clark and Henry to assign these applications to Bliss; the motion for summary judgment was granted on September 3, 1968, to the extent that the defendants were ordered to execute the assignments. The contents

of these applications are confidential with Eagle. See also 35 U.S.C. § 122.

21. Eagle has systematically endeavored to maintain the secrecy and confidentiality of its trade secrets and confidential technical information. In addition to requiring all engineering personnel to execute a trade secret agreement such as that executed by the individual defendants, Bartlett, Clark, Henry and Dinges (PX A–1, A–2, A–4 and A–5), Eagle further employs a notice on its drawings and blueprints which it submits to prospective customers, which notice is as follows:

"This drawing and information herein contained is the exclusive proprietary property of E. W. Bliss Company, it is disclosed with the understanding that it will be retained in confidence, it is not to be duplicated in whole or in part, that it will not be used for any other purpose than that for which it is disclosed, and is to be returned to the E. W. Bliss Company upon demand." (PX 5B)

22. In addition, Eagle restricts access to its Engineer Department (PX 63) and carefully protects such models or prototypes as may be demonstrated to customers and potential customers to prevent competitors from learning the substance of the technical aspects of the model or prototype. The individual defendants also acknowledged under cross-examination that Eagle possesses new, unique and confidential information in the areas alleged in Eagle's complaint.

23. Upon full consideration of the record the Court finds that Eagle does possess trade secrets of substantial value to the company and which gives Eagle a competitive advantage.

24. The defendants, Bartlett, Clark, Henry and Dinges each signed a trade secret agreement, paragraphs one and two of which are as follows:

"1. In consideration of my employment by the above company, (E. W. Bliss Company) and wages to be paid me, I agree that the above company shall be entitled to and I will promptly and fully disclose, transfer, and deliver to it any and all ideas, inventions, devices and improvements, whether patentable or not and patent applications, both United States and foreign originating with, acquired, conceived or delivered by me solely or jointly during the period of my employment, so far as the same relates to or may be useful in the business of the company as of now or at any time hereafter carried on, including experimental research work and I further agree that I will from time to time both during and after my employment, sign all papers and perform all acts necessary, proper or expedient including the giving of evidence and testimony to make this agreement effective.

2. I further agree that I will neither disclose to any person, firm or corporation or use for my personal benefit during or after my employment relating to the company's confidential affairs experimental and research work, its secrets, inventions, methods, processes, tools, machinery, formulas, drawings or appliances unless specifically authorized in writing by the company." (PX A–1, A–2, A–4 and A–5)

25. Henry's only industrial experience in solid state electronics prior to joining Struthers-Dunn has been with Eagle. While at Eagle, Henry worked on various solid state electronic projects including the solid state amplifier and the binary to decimal converter (PX 48). During his last year with Eagle, Henry worked almost exclusively on solid state process control systems for plastic molding machinery. It is these process control systems which are designed to replace the control systems previously employing relays of the type sold by Struthers-Dunn. Henry held the position of Senior Design Engineer in the Systems Design Section when he left Eagle.

26. At Eagle, Dinges held the position of Sales Engineer and, in this position, was exposed to new products being developed by Eagle. These new products included the solid state process controls

developed by Henry for plastic injection molding machines and the solid state step switch. In addition, Dinges was provided confidential sales information such as inquiry cards submitted by potential customers of Eagle products (PX 5C).

27. Clark's *only industrial experience in electronics prior to joining Struthers-Dunn was with Eagle.* Clark was frequently and with regularity promoted and given salary increases so that when he left Eagle, he held the position of Senior Systems Design Leader. Clark's duties with Eagle included work in the area of solid state traffic control devices.

28. Bartlett was exposed to all areas of Eagle's activities and specifically worked on the solid state step switch, the solid state amplifier, and ferroelectric storage capacitors (sometimes referred to as ceramic memory devices). Bartlett led the development of Eagle's new solid state traffic controller, ET 600, as well as other sophisticated electronic traffic control systems for the future. Bartlett was thoroughly familiar with all phases of Eagle's research activities. Plaintiff's Exhibit B attached to the complaint shows that Bartlett was either assigned to or associated with virtually every project in question and was an inventor, either solely or jointly, of most of these projects. In addition, he was fully informed of the long range planning of the company and frequently met with Eagle's division manager and vice-president who kept him abreast of new developments in the company.

29. Defendant Bartlett among all of Eagle's employees best understood the nature of the trade secrets here in issue. Defendant Clark worked in the area of municipal controllers and defendant Henry worked on industrial areas. They were particularly familiar with trade secrets in those areas.

30. In March, 1967, Bartlett and Clark first discussed the subject of leaving Eagle and forming a company.[2]

Shortly thereafter, Henry was also contacted by Clark on this subject and, late in March, 1967, Dinges was asked to join the group. Although some consideration was given to soliciting personnel outside of Eagle, no contacts were made. Almost immediately after talking to Clark, Bartlett sought the advice of legal counsel who has continued to advise each of these defendants both in their negotiations with Struthers-Dunn and in terminating their relationship with Eagle.

31. From the inception, it was determined that the new company which they were proposing to form would enter the solid state process control field. Thereafter, consideration was given to finding financial support for the organization. The first thought was to seek financial backing from another company and it was agreed that Struthers-Dunn was an excellent possibility for such support. A meeting with Struthers-Dunn was quickly arranged through Dinges and this meeting was held in June, 1967, in Chicago. The meeting was attended by the president and vice-president of Struthers-Dunn, Mr. John Pfeffer and Mr. George Conger, together with the four defendants. Mr. Pfeffer immediately expressed an interest in talking further with the defendants and told them that Struthers-Dunn was, and had been for a number of years, interested in entering the solid state process control field. Subsequent meetings approximately four or five in number, were held with Struthers-Dunn during the period of time Bartlett, Clark, Henry and Dinges continued on the payroll of Eagle and at no time advised Eagle that any of them were planning to leave Eagle. It was during this same period that Henry was actively working for Eagle on process control systems for plastic molding machinery.

32. Struthers-Dunn was vitally interested in acquiring the services of Bartlett, Clark, Henry and Dinges.

---

2. There is testimony that, at about this same time, Bartlett approached another Eagle employee and proposed that they secretly develop products on Eagle's time, after which they would leave the Company and form their own organization (Tr. 375, 376). However, nothing further came of this proposal.

This is amply evidenced not only by the participation of its top level executives in the meetings with these men, but also by the admissions of Struthers-Dunn (PX 62). Mr. Conger is quoted in a Struthers-Dunn memorandum (PX 62) that "what we want is experience that they have gained over the years." This same memorandum quotes Mr. Pfeffer as follows:

"We are not experienced in solid state work, and we have to look to young people the same as Eagle has done."

The reason for Struthers-Dunn's interest in these men is apparent from this same memorandum in which Mr. Pfeffer admits that Eagle is competing with their relay business and they are losing business to this solid state equipment. In fact, the hiring of these men was of such importance that the Board of Directors of Struthers-Dunn met with them.

33. The value placed on these men by Struthers-Dunn is further indicated by its acceptance of their request that a facility be established in the Davenport area rather than in Pitman, New Jersey where the main corporate offices are located. Struthers-Dunn did refuse to provide financial support for a separate company and, instead, persuaded them to accept employment with it at salary increases of approximately $5,000 each. By October 9, 1957, an agreement had been reached whereby a Systems Division of Struthers-Dunn would be established in Bettendorf, Iowa with Bartlett, Clark, Henry and Dinges operating the division as employees of Struthers-Dunn and reporting directly to Mr. Pfeffer.

34. Clark and Henry submitted their resignations on October 10, 1967. Dinges resigned on October 11, 1967 and Bartlett resigned on October 13, 1967. Clark, Henry and Dinges individually admitted to Eagle, when asked, that they were going to work for Struthers-Dunn, but Henry and Clark falsely denied any knowledge of Bartlett's agreement with Struthers-Dunn. Bartlett falsely denied having any specific plans for employment upon leaving Eagle including denying that he had accepted employment with Struthers-Dunn. Bartlett even stated to Eagle management that he was "shocked" when informed that Clark and Henry were leaving. Eagle management attempted to convince Bartlett to remain and, to this end, the division manager of Eagle had a meeting with Bartlett on October 16, 1967. At this meeting, Bartlett reiterated his decision to resign but again indicated that he had no specific plans upon leaving Eagle. However, the day before this meeting, on October 15, 1967, the Systems Division of Struthers-Dunn, to be manned by Bartlett, Clark, Henry and Dinges, opened its doors. Although Bartlett, Clark and Henry each gave Eagle four weeks notice to enable them to complete the projects on which they were working and assist in training other Eagle employees to take over their duties, all three abruptly terminated their employment on October 24, 1967 and commenced employment with Struthers-Dunn.

35. It is apparent that with Clark and Henry having no industrial experience other than that acquired at Eagle, and with Bartlett having received intensive training by Eagle in its product lines, it would be extremely difficult for the defendants to work in a competitive area such as process controls without making use of the trade secrets of Eagle. Defendants Bartlett and Henry have indicated that they intended to copy the products of their competitors, other than Eagle, in this field. It appears that the defendants would copy Eagle's products as well if given the opportunity. In fact, the individual defendants have little choice in deciding whether or not they will copy Eagle's products. The president of Struthers-Dunn controls the Systems Division and directs its activities, not the individual defendants. Mr. Pfeffer has stated it was his duty to protect the business of Struthers-Dunn (PX 62) and this business is facing a serious challenge from companies such as Eagle.

36. Other facts and circumstances point up the threat to Eagle. For example, the complaint, as amended, filed by

the defendants in Philadelphia seeks a declaratory judgment that "the things that the four individual plaintiffs (Bartlett, Clark, Henry and Dinges) were working on as employees of Bliss did not constitute trade secrets." It is apparent from this pleading that the defendants want to be free to use any and all knowledge acquired at Eagle. That at least some of the defendants feel free to use Eagle's trade secrets without restriction was confirmed by Bartlett who expressed the opinion in court that Eagle has no trade secrets.

37. In his opening statement, defendants' counsel, Mr. Hall, characterized Eagle's trade secrets to a square inch in a ten acre field, stating "Now, these men, maybe they deny that the square inch exists at all, but we are not going to risk that. We are going to operate in an entirely free area of the park." However, it is significant that the defendants are now operating in the area of process controls for plastic molding machines, the same as Eagle.

38. After considering all the evidence, the Court finds that the individual defendants left Eagle with the intent of going to work for Struthers-Dunn in the process control field and other areas involving trade secrets in direct competition to Eagle.

39. Defendants contend that if a preliminary injunction is granted serious damage will result to them. In this connection it is their contention that the individual defendants were hired, not because of any specific product line, but because of their general experience and knowledge. It is contended that there are many areas of solid state electronics in which these men could work without coming close to Eagle's areas of trade secrets. From these contentions, it appears that an injunction prohibiting the individual defendants from working in specific areas such as the process control field, as well as the other areas in which Eagle alleges it has trade secrets, would not diminish their value to Struthers-Dunn during the pendency of this suit, since, presumably, there are many other areas in which they could be profitably employed. It appears that any damages which defendants might suffer by the entry of a preliminary injunction are not great and they can be protected by an appropriate bond.

## CONCLUSIONS OF LAW

40. The Court has jurisdiction of the subject matter and the parties in this suit. 28 U.S.C. § 1332. Venue is properly laid in this district. 28 U.S.C. § 1391. Since this action is based on diversity the Court must apply the Iowa conflict of laws rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

41. Whether a breach of a contract has occurred or is threatened is ascertained by the law of the place of performance. Hunt Truck Sales and Service, Inc. v. Omaha Standard, D.C., 187 F. Supp. 796 (1960); Elk River Coal & Lumber Co. v. Funk, 222 Iowa 1222, 271 N.W. 204, 208, 110 A.L.R. 1415 (1937). The agreements signed by Bartlett, Clark, Henry and Dinges comprise personal undertakings by each individually to respect and maintain in confidence the trade secrets of Bliss. The place of performance for such agreements is wherever each individual is employed, in this case, Iowa. Accordingly, Iowa law governs performance under these agreements.

42. A provision in an employment contract requiring that the employee not use or disclose the trade secrets of his employer is a reasonable restraint. Even in the absence of such a contract, it is well established that the law implies an obligation on the employee not to use for his own advantage, and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment. Hulsenbusch v. Davidson Rubber Co., 344 F.2d 730 cert. denied 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (8th Cir. 1965); Sandlin v. Johnson, 141 F.2d 660 (8th Cir. 1944).

43. The primary purpose of a preliminary injunction is not to deter-

mine any controverted right, but to prevent a threatened wrong, and to preserve the status quo of the parties until a final hearing can be had on the merits. A preliminary injunction should be granted where the injury to the moving party will be irreparable and the interest of the opposing party may be protected by bond. Chicago B & Q R.R. v. Chicago Great Western R.R., 190 F.2d 361, 363 (8th Cir. 1951); Benson Hotel Corp. v. Woods, 168 F.2d 694, 697 (8th Cir. 1948).

44. A trade secret may consist of any formula, process, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. Sandlin v. Johnson, 141 F.2d 660, 661 (8th Cir. 1944); Restatement of Torts, § 757 (comment b). It is apparent from the evidence in this case that Bliss does possess trade secrets in the areas enumerated in the complaint and that Bartlett, Clark, Henry and Dinges, by reason of their former employment, are thoroughly familiar with these trade secrets. It is not necessary that a trade secret be absolutely secret; qualified secrecy is sufficient. Franke v. Wiltschek, 209 F.2d 493, 495 (2d Cir. 1953); Sandlin v. Johnson, supra.

45. It matters not that the defendants could obtain the trade secrets of the plaintiff from other sources, such as a marketed product, the essence of this action is one of threat of breach of confidential relationship. The fact that a trade secret can be discovered by experimentation or other lawful means does not deprive its owner of the right to protection from those who have obtained possession thereof in confidence and would unlawfully use these secrets. Du Pont De Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917); Franke v. Wiltschek, 209 F.2d 493, 495 (2d Cir. 1953); Smith v. Dravo Corp., 203 F.2d 369, 375 (7th Cir. 1953).

46. Aside from the contractual obligations of Bartlett, Clark, Henry and Dinges, the evidence indicates that each was either employed to develop new products for Eagle or to work with prospective customers concerning these new products. These individuals were well aware of the proprietary nature of these products and gained this knowledge through their relationship of employment with Eagle. Having gained this knowledge through a position of trust and confidence, each of these individuals must respect this confidential relationship.

47. There can be no serious dispute concerning the knowledge of plaintiff's secret developments possessed by Bartlett, Clark and Henry, since these individual defendants, while employees of the plaintiff in positions of trust and confidence, either originated or materially helped to develop all projects, the basis of plaintiff's claims to trade secrets. And, in view of the allegations and prayer for declaratory judgment, C.A. 44022 brought by defendants (plaintiffs there) in the Federal District Court for the Eastern District of Pennsylvania, the desire and intent to transmit knowledge of plaintiff's developments to Struthers-Dunn is confirmed.

48. Trade secrets are not measured by the law of patents. The defendants contention that plaintiff's trade secrets must be patentable in order to obtain protection against disclosure is in error. The doctrine of prior art, vital in patent cases is not so relevant in this case. Threat of disclosure and breach of faith is the issue here. Sandlin v. Johnson, 141 F.2d 660 (8th Cir. 1944); Franke v. Wiltschek, 209 F.2d 493, 495–496 (2d Cir. 1953); Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp., 255 F.Supp. 645, 653 (E.D.Mich.1966).

49. There must be a substantial threat of impending injury before an injunction will issue. Defendants have by their statements and acts demonstrated that they have little regard for their fiduciary obligations to their former employer; therefore, plaintiff is entitled to a stringent and effective preliminary injunction necessary to protect the plaintiff from irreparable harm and to maintain the status quo until a full hearing of this case on the merits can be

held. Protection of trade secrets and maintenance of the status quo may require the prohibition of any work for a competitor in the fields relating to the trade secrets. Allis-Chalmers Mfg. Co. v. Continental Aviation & Engr. Corp., 255 F.Supp. 645, 654 (E.D.Mich.1966). Such is the case here. Defendants have entered the field of process controls in direct competition with Eagle.

50. Upon consideration of the pleadings, exhibits, and testimony of witnesses, it appears to the Court that there exists a clear and present substantial danger that the trade secrets and proprietary information of Eagle will be disclosed or used by defendants to the irreparable harm of plaintiff. If the status quo is to be maintained and possible irreparable harm to Eagle avoided until a full hearing on the merits may be held, a preliminary injunction is necessary.

An order is being entered forthwith in conformity with these findings.