**PETER KIEWIT SONS' CO., a
corporation, Plaintiff,**

v.

**IOWA SOUTHERN UTILITIES CO.,
a corporation, et al., Defendants.**

**Civ. No. 8–2397–C–2.**

United States District Court,
S. D. Iowa, C. D. ,

Feb. 21, 1973.

Lowell C. Kindig, Maurice B. Nieland, Kindig, Beebe, McCluhan, Rawlings & Nieland, Sioux City, Iowa, for plaintiff Peter Kiewit Sons' Co.

C. R. S. Anderson, Gen. Counsel, Iowa Southern Utilities Co., Centerville, Iowa, Herschel G. Langdon, Herrick, Langdon, Belin & Harris, Des Moines, Iowa, for defendant Iowa Southern Utilities Co.

W. C. Hoffmann, Jones, Hoffmann & Davison, Kent M. Forney, Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, Iowa, for defendants Nathan Thomas Veatch et al. d/b/a Black & Veatch.

## MEMORANDUM AND ORDER.

HANSON, Chief Judge.

Peter Kiewit Sons' Co. (hereinafter Kiewit or the plaintiff), a Nebraska corporation, brings this lawsuit against Black & Veatch (hereinafter also the Engineer), a Missouri partnership, and Iowa Southern Utilities Co. (hereinafter Iowa Southern or the Owner), a Delaware corporation with its principal place of business in Iowa. The matter in controversy exceeds $10,000, exclusive of interest and costs. The Court concludes that it has jurisdiction over the subject matter of this action by reason of diversity of citizenship of the parties. 28 U. S.C., Section 1332(a).

The action arises from the work performed by the plaintiff under a construction contract dated May 13, 1966, in connection with the construction of a new generating station for Iowa Southern at Burlington, Iowa. In general, the construction work began in May of 1966 and was finally completed in 1968.

This cause came on for trial before the Court and the Court, having considered the evidence submitted, makes the following:

## FINDINGS OF FACT:

1. Iowa Southern is a public utility engaged, among other things, in the production and sale of electricity. In 1964, Iowa Southern decided to build a new fossil fueled steam generating plant on the Mississippi River near Burlington, Iowa. After interviewing several engineering firms, it entered into an agreement, on April 10, 1964, with Black & Veatch, whereby Black & Veatch agreed to render certain services including the designing of the plant, the preparation of adequate plans, specifications, and contract documents relating to the several different phases of construction, and, ultimately, the supervision of the actual performance of construction activities on the job site. The contract required the new plant to be in operation by May 1, 1968. Black & Veatch agreed in the contract to perform the services called for "in accordance with the highest standards of the engineering profession."

2. One provision of the contract between Black & Veatch and Iowa Southern required the Engineer to prepare construction plans and specifications in such detail that lump-sum proposals could be received from prospective contractors. Other provisions required Black & Veatch to properly coordinate and expedite the work, and to perform all tasks required "in obtaining strict compliance with contracts, plans and specifications."

3. Pursuant to the contract with Iowa Southern, Black & Veatch began the preliminary work, which included obtaining for Iowa Southern bids on various items of equipment, such as the boiler, turbine and generator, to be purchased for installation in the proposed building. In addition, the Engineer began to prepare the necessary plans and specifications for construction of the building. Before the final plans, specifications and construction schedules could be prepared, however, it was necessary to obtain the contracts, including shipping dates, for the major items of equipment to be installed in the building, since the installation of this equipment had to be integrated into the construction process. The contracts for the boiler, turbine and generator were apparently awarded in late 1965. Combustion Engineering Co. was awarded the contract for the boiler and General Electric Co. was awarded the contract for the turbine.

4. Rather than let one general contract to one prime contractor who would be responsible for the entire construction of the project, Black & Veatch chose that Iowa Southern should award several prime contracts, breaking down the actual construction into several

areas by the type of work involved. The Engineer determined that the structural steel contract, which included supplying and erection of the structural steel, would be let as one prime contract. The general construction, mechanical construction, and electrical construction contracts were put out for bid on a unified basis, so that contractors could bid on all three contracts or on only one or two of them.

5. The structural steel plans were released to bidders on January 28, 1966. The successful bidder for this contract was Havens Steel Co. The contract between Iowa Southern and Havens was awarded on March 8, 1966, and actually signed on March 15, 1966.

6. Contemporaneous with this activity, Black & Veatch were preparing an overall schedule of the construction. This overall construction schedule was in the form of a modified bar chart, known in the record as G–1, and was issued by Black & Veatch on March 11, 1966. The construction schedule, G–1, set out estimated dates for the delivery of major components and the sequence and schedule for constructing the plant. The schedule was designed to coordinate work under the various prime contracts and to establish the basic working periods, construction sequence, and completion dates for certain phases of the work. G–1 was made part of the general, mechanical and electrical contracts, but was not included in the boiler, turbine or structural steel contracts because they had been awarded prior to the issuance of G–1.

7. Bids were then requested on the general, mechanical and electrical contracts. Peter Kiewit Sons' Co., the plaintiff herein, was the successful bidder on the general contract, and the agreement forming the basis of this lawsuit was entered between Kiewit and Iowa Southern on May 13, 1966. Winger Construction Co. was awarded the mechanical contract, and A. G. Shulman Electric Co. was awarded the electrical contract.

8. The entire project cost in excess of $23 million. Kiewit's contract, as adjusted, was for $3,284,221.00. The general construction contract awarded Kiewit called for such things as the driving of pilings for foundation work, the pouring of concrete slabs at various elevations of the powerhouse structure and in outlying structures, the erection of the walls, ceilings and roof of the various structures, and the painting involved in the project. Kiewit subcontracted the painting portion to Chicago Painting Service, Inc.

9. The contract between Iowa Southern and Havens Steel Co. required Havens to commence work on July 15, 1966, and to have the steel sufficiently erected to allow hoisting of the boiler drum to commence October 1, 1966. The Havens contract did not contain any other intermediate dates nor did it incorporate G–1, which did contain intermediate dates for some phases of the construction.

The construction contracts with Kiewit and each of the other contractors, including Havens, required the contractor to submit, within 30 days after award of contract, "a detailed construction schedule showing the time schedule for completion of each element of the work. The detailed schedule shall be based on the Construction Schedule but shall be expanded to include a complete breakdown of all elements of work." Havens, before commencing its work on the structural steel, furnished and became bound to its own detailed construction schedule, which generally followed and was compatible with the schedule G–1. Kiewit also furnished a detailed construction schedule which followed G–1 generally, but also included some fairly substantial deviations from G–1.

10. The entire agreement between Iowa Southern and Kiewit, excepting a later contract modification which will be discussed subsequently, is contained within two volumes, in evidence in this cause as Exhibit 1. The Court will devote its attention to items contained in Volume I, as Volume II contains techni-

cal specifications not now at issue. By provision of the signed contract, Iowa Southern is referred to as the "Owner" in all contract documents, and Kiewit is referred to as the "Contractor."

Article I of the Contract Agreement provided that

"The Contractor shall perform the General Construction for Unit 1 of the Owner's Burlington Generating Station, Burlington, Iowa, in accordance with Volumes I and II of the specifications. . . ."

Article III of the Contract Agreement provided that

"Time of completion is of the essence of the Contract Agreement, and that the Contractor shall proceed with the work in accordance with the specified schedule."

11. Some provisions pertinent to this lawsuit are found in the "Instructions to Bidders," found in Volume I and incorporated by reference into the contract between Iowa Southern and Kiewit. On page IB–6 are found the following items:

"TIME OF COMPLETION. The time of completion of the work is a basic consideration of the contract. The proposal shall be based upon completion of the work in accordance with the Construction Schedule, Sheet G1, bound with the drawings. It will be necessary that the bidder satisfy the Owner of his ability to complete the work within the stipulated time.

In this connection, attention is called to the provisions of the attached General Conditions and Special Conditions relative to delays, extension of time, and detailed scheduling of construction.

"INFORMATION CONCERNING SEPARATE CONTRACTS. Prospective bidders may examine at the office of the Engineer available specifications, drawings and data regarding materials and equipment to be furnished and work to be performed under separate contracts awarded by the Owner. Specific information regarding the extent of factory assembly, erection requirements and other details shall be obtained by the bidders directly from the manufacturers.

"LOCAL CONDITIONS. Each bidder shall visit the site of the work and thoroughly inform himself of all conditions and factors which would affect the prosecution and completion of the work and the cost thereof, including the arrangement and conditions of existing or proposed structures affecting or which are affected by the proposed work, the procedure necessary for maintenance of uninterrupted operation, the availability and cost of labor, and facilities for transportation, handling and storage of materials and equipment."

Under the heading "General Conditions" found in Volume I and incorporated by reference into the contract between Iowa Southern and Kiewit are further pertinent items:

"GC–15. RELATIONS WITH OTHER CONTRACTORS. The Contractor shall cooperate with all other contractors who may be performing work in behalf of the Owner and workmen who may be employed by the Owner on any work in the vicinity of the work to be done under this contract, and he shall so conduct his operations as to interfere to the least possible extent with the work of such contractors or workmen. He shall promptly make good, at his own expense, any injury or damage that may be sustained by other contractors or employees of the Owner at his hands. Any difference or conflict which may arise between the Contractor and other contractors or between the Contractor and workmen of the Owner in regard to their work shall be adjusted and determined by the Engineer. If the work of the Contractor is delayed because of any acts or omissions of any other contractor, the Contractor shall have no claim against the Owner on that account other than an extension of time.

Whenever there is interference with work under other contracts, the Engineer shall decide the manner in which the work shall proceed under each contract.

"GC–17. *AUTHORITY OF THE ENGINEER.* To prevent delays and disputes, and to discourage litigation, it is agreed by the parties to this contract that the Engineer shall determine the quantities of work which are to be paid for under the contract and shall determine all questions in relation to the work.

If in the opinion of the Contractor or the Owner a decision made by the Engineer is not in accordance with the meaning and intent of the contract, either party may file with the Engineer and the other party to the contract, within thirty (30) days after receipt of the decision, a written objection to the decision. Failure to file an objection within the allotted time will be considered acceptance of the Engineer's decision and the decision shall become final and conclusive.

The Engineer's decision and the filing of the written objection thereto shall be a condition precedent to the right to request arbitration or to start action in court.

It is the intent of this agreement that there shall be no delay in the execution of the work and the decision of the Engineer as rendered shall be promptly observed.

"GC–22. *MODIFICATIONS.* The Contractor shall modify the work whenever so ordered by the Owner and such modifications shall not affect the validity of the contract. Modifications may involve increases or decreases in the amount of the work for which appropriate contract price adjustment will be made.

Except for minor changes which involve no contract price adjustment or other monetary consideration, and with the exception of adjustments of estimated quantities for unit price work or materials to conform to actual pay quantities, all modifications shall be made under the authority of duly executed change orders issued and signed by the Owner and accepted and signed by the Contractor.

"GC–22.01. *Extra Work.* If a modification increases the amount of the work, and the added work or any part thereof is of a type and character which can properly and fairly be classified under one or more unit price items of the Proposal, then the added work or part thereof shall be paid for according to the amount actually done and at the applicable unit price or prices. Otherwise, such work shall be paid for as hereinafter provided.

Claims for extra work will not be paid unless the work covered by such claims was authorized in writing by the Owner and the Contractor shall not have the right to prosecute or maintain either an arbitration proceeding or an action in court to recover for extra work unless his claim is based upon a written order from the Owner. Payments for extra work shall be based on agreed lump sums or on agreed unit prices whenever the Owner and the Contractor agree upon such prices before the extra work is started; otherwise, payments for extra work shall be based on actual field cost plus the specified percentage allowance.

"GC–27. *SUSPENSION OF WORK.* The Owner reserves the right to suspend and reinstate execution of the whole or any part of the work without invalidating the provisions of the contract. Orders for suspension or reinstatement of work will be issued by the Owner to the Contractor in writing. The time for completion of the work will be extended for a period equal to the time lost by reason of the suspension.

Extra costs and expenses which, in the opinion of the Engineer, are caused by work suspensions ordered by the Owner will be paid by the Owner to the Contractor.

"GC–34. *BEGINNING, PROGRESS, AND TIME OF COMPLETION OF WORK*. Unless otherwise specified the Contractor shall begin work under this contract within ten (10) days after the date designated in a written order from the Owner to begin work. The rate of progress shall be such that the work will be completed in accordance with the terms of the contract on or before the termination of the construction period named in the Contract Agreement. The Contractor shall furnish the Engineer a detailed schedule setting forth the procedure he proposes to follow and giving the dates he expects to start and to complete portions of the work. If in the opinion of the Engineer proper progress is not being maintained, changes shall be made in the Contractor's operations to assure proper progress.

"GC–35. *HINDRANCES AND DELAYS*. The Contractor expressly agrees that the construction period named in the Contract Agreement includes allowance for all hindrances and delays incident to the work. No claim shall be made by the Contractor for hindrances or delays from any cause during the progress of the work, except as provided under "Suspension of Work" and "Extensions of Time."

"GC–36. *EXTENSIONS OF TIME*. Should the Contractor be delayed in the final completion of the work by any act or neglect of the Owner or Engineer or of any employee of either, or by any other contractor employed by the Owner, or by strike, fire, or other cause outside of the control of the Contractor and which, in the opinion of the Engineer, could have been neither anticipated or avoided, then an extension of time sufficient to compensate for the delay, as determined by the Engineer, will be granted by the Owner provided that the Contractor gives the Owner and the Engineer prompt notice in writing of the cause of delay in each case and demonstrates that he has used all reasonable means to minimize the delay.

Extensions of time will not be granted for delays caused by unfavorable weather, unsuitable ground conditions, inadequate construction force, or the failure of the Contractor to place orders for equipment or materials sufficiently in advance to insure delivery when needed.

"GC–45. *RELEASE OF LIABILITY*. The acceptance by the Contractor of the last payment shall be a release to the Owner and every officer and agent thereof from all claims and liability hereunder for anything done or furnished for, or relating to the work, or for any act or neglect of the Owner or of any person relating to or affecting the work."

Under the heading "Special Conditions" found in Volume I and incorporated by reference into the contract between Iowa Southern and Kiewit are these additional pertinent items:

"*CONSTRUCTION SCHEDULE*. The time of completion and commercial operation of the new station is of the essence of this contract. The work shall be vigorously and systematically prosecuted to the end that all systems will be ready for start-up and initial operation as a complete electric power generating unit not later than March 1, 1968 and that the unit will be in firm commercial operation not later than May 1, 1968. The installation of the equipment, systems and subsystems shall be completed so that they can be given trial operation and necessary adjustments can be made before the plant start-up and initial operation specified above.

In addition to compliance with the above dates, the Contractor shall comply with the intermediate dates set forth in the Construction Schedule and shall complete all work and remove all of his construction plant facilities from the site before July 1, 1968.

. . . . . .

The Construction Schedule, Sheet G1 of the construction drawings, shows in

graphical form all construction to be performed concurrently at the site. The purpose of this Construction Schedule is to coordinate related work under the various construction and erection contracts and to establish the basic working periods, construction sequence, and completion dates for certain phases of the work.

Starting dates graphically shown on the schedule are intended to designate the latest starting date permissible for compliance with the overall schedule. Earlier starting dates shall be adopted whenever possible.

The Contractor shall cooperate with the Engineer as set forth herein under "PROJECT MANAGEMENT" to assure maximum coordination and efficiency in the construction progress.

Failure of the Engineer to inform the Contractor that he is behind schedule or to direct and enforce procedures for complying with the schedule shall not relieve the Contractor of his responsibility for completing his work in accordance with the Construction Schedule and shall not be cause for an extension of time.

*Contractor's Detailed Schedule.* Within 30 days after award of contract, the Contractor shall submit a detailed construction schedule showing the time schedule for completion of each element of the work. The detailed schedule shall be based on the Construction Schedule but shall be expanded to include a complete breakdown of all elements of work. The schedule shall be presented in graphical form using the bar graph method, the critical path method (CPM), or the time-sequence method similar to the Construction Schedule.

The Contractor's detailed schedule shall be periodically revised to reflect the actual progress of the work, and shall be modified as necessary for coordination of his operations with those of other contractors.

In addition to the above detailed schedule covering the entire life of the project, the Contractor shall prepare and submit at the beginning of each month during the construction period a schedule covering his operations for the coming 30 day period. Included with this schedule shall be an estimate of the total manpower required and the necessary equipment for the anticipated construction operations. This information shall be submitted to the Engineer's Project Manager at the site and will be used to coordinate all contractors' operations at the weekly meetings as set forth under "PROJECT MANAGEMENT."

*Delays.* Failure of Owner-furnished materials and equipment to arrive before the time required for construction or failure of other construction contractors to meet their schedule shall not be justification for claim for extra compensation.

Failure of Owner-furnished materials and equipment to arrive before the time required for construction and failure of other construction contractors to meet their schedule shall not be justification for an extension of time as stipulated in the General Conditions, except where such failure causes, in the opinion of the Engineer, an actual delay in the Contractor's work, and providing that notice in writing of such delay is given to the Owner and Engineer within three days of the alleged delay.

*PROJECT MANAGEMENT.* The coordination of all field construction shall be under the direction of the Engineer acting through its Project Manager at the site.

A meeting of the Engineer and all contractors at the site will be held each week at the time and place designated by the Engineer. The Contractor's superintendent shall attend each weekly meeting. The purpose of the weekly meeting will be for the scheduling and coordination of each contractor's work within the requirements of the overall project. In the event conflicts arise between contractors concerning scheduling or coordi-

nation, the Engineer will make the final decision resolving the conflict. The Engineer's decision shall not be cause for extra compensation or for extension of time.

If at any time the Contractor's work is behind schedule (as set forth herein under "CONSTRUCTION SCHEDULE"), the Engineer may direct him to increase his forces or otherwise accelerate his operations to comply with the schedule and the Contractor shall put into effect immediately definite procedures approved by the Engineer for getting the work back on schedule. The Contractor will not be allowed extra compensation for costs incurred by him because of additional regular or premium time required to keep his work on schedule.

*"PROTECTION OF WORK.* The Contractor shall be solely responsible for the protection of his work until its final acceptance by the Owner.

The Contractor shall have no claim against the Owner or the Engineer because of any damage or loss to the Contractor's work, and shall be responsible for the complete restoration of damaged work to its original condition complying with the specifications and drawings.

In the event the Contractor's work is damaged by another party, not under his supervision or control, the Contractor shall make his claim directly with the party involved. If a conflict or disagreement develops between the Contractor and one of the other contractors concerning the responsibility for damage or loss to the Contractor's work, the conflict may be submitted to the Engineer for his decision, with the understanding that both parties will abide by his decision. Such conflict shall not be cause for delay in the restoration of the damaged work. The Contractor shall restore the work immediately and the cost thereof shall be assigned pending the resolution of the conflict."

12. Kiewit officials had carefully reviewed the proposed construction schedule, G–1, during the spring of 1966 and had found it to be a reasonable and feasible schedule. Kiewit officials carefully read and considered all contract documents before bidding and relied upon and took into account these documents in making the determination of Kiewit's bid for the general construction contract.

13. Kiewit officials visited the construction site before submitting the bid. Kiewit was aware of the confined nature of the site. Furthermore, Kiewit had extensive previous experience in building steam generating plants and was aware of the crowded conditions inside the buildings during construction thereof.

Although the contract documents advised Kiewit to ascertain details of the operations of other contractors from those contractors, Kiewit never inquired of Havens Steel Co. about its schedule concerning proposed delivery or erection dates.

14. Sometime in the late spring of 1966, Havens Steel Co. began the work for which it had contracted. After a schedule satisfactory to both the Engineer and Havens had been worked out, Havens began the preparation of shop drawings of the steel members it was to produce. Prior to the award of the structural steel contract, the Engineer had thoroughly investigated Havens, and had determined that Havens could perform its contract. That notwithstanding, it soon became apparent that Havens was not producing acceptable shop drawings fast enough to maintain the Engineer's construction schedule. Black & Veatch immediately took steps to cure this problem. The Engineer had extensive communications with Havens about how to improve the shop drawings. On more than one occasion, engineers from Black & Veatch personally visited the Havens plant in an effort to correct and speed up the steel drawings. Havens, for its part, began to devote more effort to producing the drawings, and the Engineer, for its part, devoted more manpower to reviewing the drawings so that

they could be returned to Havens faster. The shop drawings, as a result, were sufficiently complete to enable Havens to begin work at the site in July of 1966, according to schedule.

15. Further delays, however, began to plague Havens after it commenced work at the site. Havens had previously placed orders with various steel mills for the raw steel needed for fabrication of the steel members. For various reasons, none of which could be deemed the result of bad planning on the part of Havens or Black & Veatch, a substantial portion of the raw steel did not arrive at the Havens plant as scheduled. Oftentimes, the missing steel was a certain critical length needed in order to complete the fabrication of steel members needed at a particular instant on the job. Thus, Havens experienced many substantial delays in fabricating and erecting the structural steel on the job site, and Havens' delays created corresponding delays for other contractors, including Kiewit, who were dependent upon the steel being erected before they could commence with their work.

The Engineer and Havens devoted considerable time in attempting to speed up the steel erection. It was the considered judgment of the Engineer and Havens that running a night shift of iron workers was not feasible because of the danger involved in working at heights at night and the lack of additional qualified iron workers as a result of other major construction taking place in the Burlington area. The Engineer and Havens finally decided to run longer day shifts at premium time, and this speeded up the steel erection as much as possible under the circumstances.

16. Further delay in the project was caused when the boiler, to be supplied by Combustion Engineering, failed to arrive at the date anticipated, that being October of 1966. This delay was caused by a strike at the Combustion Engineering plant. Many facets of the project, including some of the steel erection and some of the concrete pouring, were dependent upon the erection of the boiler drum, and this work was held up as a result. Black & Veatch communicated extensively with Combustion Engineering about early shipment of the boiler drum, but Combustion replied that it would have to meet commitments to other projects before it could ship the boiler drum to Burlington, as the strike had caused a general back log in filling orders at Combustion.

The boiler drum finally arrived at Burlington in December of 1966 and its erection commenced soon thereafter. In February of 1967, however, a large piece of piping fell from some considerable height when the cable supporting it snapped. The piping created extensive damage to some of the structural steel members, and these members had to be replaced. All of this delayed Kiewit in pouring the concrete slabs in the boiler area.

17. Havens Steel Co. began erection of the structural steel in the boiler area of the main building in July of 1966, approximately on schedule. At the same time, Kiewit began fine grading of the boiler area in anticipation of the pouring of the ground floor slabs, which was to commence in late August of 1966. Kiewit was ready to pour the concrete for the ground floor in the boiler area on schedule, but for reasons outlined previously, Havens had not erected sufficient steel so that the steel could be encased in concrete.

18. In early September, Kiewit moved its concrete workers to the outlying buildings to do the concrete work there. The piling work which Kiewit had subcontracted to another firm and for which Kiewit was responsible was behind schedule in the out-buildings and accordingly, Kiewit found itself with little work to do and had to reduce its labor force.

19. By August 19, 1966, Kiewit was running over its estimated costs for labor by approximately $20,000. This overrun was incurred prior to any of the events of which Kiewit complains in this cause of action. Because of the cost overrun and because Kiewit could fore-

see scheduling problems in future months, a decision was made to replace the job superintendent then on the site with a man having engineering and scheduling experience.

20. Many factors caused Kiewit to be unable to lay concrete slabs at the times anticipated by schedule G–1. Among the most significant were the failures of Havens Steel Co. and Combustion Engineering Co. to meet their schedules. In addition to the basic problem of not being able to pour concrete slabs because the structural steel was not in place, Kiewit was hindered in its work by Havens' habitual practice of storing equipment and materials in places in which Kiewit was supposed to work. Havens was from time to time admonished by the Engineer to remove its materials and equipment from Kiewit's work area, but at times the materials and equipment could not reasonably be stored in any other place. Nevertheless, Kiewit had to move Havens' materials out of the way on some occasions. Furthermore, when steel erection commenced at higher elevations of the building, Kiewit on some occasions was not able to work underneath because of the danger of falling objects dropped by Havens' workers. George Hirt, Black & Veatch's representative on the site, continually admonished Havens to observe safe practices, but did not insist that Havens erect netting or other devices to restrain the falling objects because of the impracticality of doing so. On some occasions the danger of falling objects forced Kiewit out of the area in which it was to do concrete work.

Kiewit's work during the late fall and winter of 1966 was further complicated because of the remedial measures taken by Havens and Combustion Engineering to expedite their work. Both Havens and Combustion Engineering employed many extra laborers in an attempt to get back on schedule. These extra men necessarily created much more congestion in a very confined working area. Thus some workers of Havens and Combustion Engineering got in the way of Kiewit's workers and caused some delay for Kiewit.

In addition, because of the dangers involved in the erection of the boiler drum, Kiewit was forced to suspend operations in the boiler area until the erection of the drum was completed. The erection of the boiler drum, once it arrived on the job site, was delayed somewhat because of difficulties encountered in trying to put it together.

21. By mid-October two additional factors began to hamper completion of construction. Commencing in October 1966 and lasting far into 1967, the Burlington area was deluged by rain. During the last four months of 1966, 11 full days and 2 part days were lost because of weather.

Access to the job site was quite restricted because of topographical conditions. Kiewit was responsible for maintaining the only access road to the site. As more and more rain came down the access road became a quagmire. Kiewit, on the order of George Hirt, poured large quantities of gravel on to the road until the allotted supply was used up and it became apparent that the rock was doing no good in any event. In the fall of 1966, Kiewit had proposed that another road be built to the site, but other contractors were unwilling to share in the costs of such a road and Kiewit was unwilling to finance the road itself. Finally, Kiewit used a large tractor to pull vehicles of all contractors into the construction area. This caused much more congestion and hardship to contractors including Kiewit.

In addition, labor problems caused some delay in construction work. For example, during the last four months of 1966, 6 full days were lost because of labor problems—basically a dispute arose with the operators which caused trucks to be backed up on the job site.

22. When it made its bid, Kiewit had planned to be able to make the largest pours possible in a given location. Furthermore, Kiewit had planned to be able to block out certain portions of the

ground floor slabs in the turbine area and thus be able to pour that slab prior to the steel erection and erection of the turbine. In actual practice, it turned out that Kiewit had to make much smaller pours than it had planned. These smaller pours were made on the orders of the Engineer in its attempt to expedite the work of all contractors. The smaller pours caused Kiewit to have to use more lumber in the making of forms and caused some of the reinforcing steel (re-steel), used to give the concrete added strength, to be exposed pending the pouring of other concrete slabs. Extensive damage was done to Kiewit's form work and to exposed re-steel by Kiewit's own workers and by workers of other contractors as a result of much muddy foot traffic running over Kiewit's work. Kiewit and the Engineer attempted to stop this destruction by roping off the area and by other means, but Kiewit's work continued to be damaged from time to time. This resulted in additional work for Kiewit in remaking the forms and in cleaning the re-steel.

Kiewit was not able to block out portions of the turbine area, as it had anticipated, because it could not come up with a feasible plan for so doing. Black & Veatch talked with Kiewit and encouraged Kiewit to come up with a feasible plan for blocking out certain areas, but no viable method for blocking out was found. Thus the pouring of the concrete in the turbine area was not done in the manner Kiewit had anticipated and was done at a time when the area was much more congested. Furthermore, Havens Steel was quite late in erecting the steel in the turbine area, and this also caused delay for Kiewit.

23. From August through December of 1966, only four contractors were on the job site—Havens, Combustion Engineering, Kiewit, and the piping contractor. In December, other contractors, including some more of Kiewit's subcontractors, came into the site. This, of course, increased the congestion on the job site and greatly enlarged the Engineer's problem of coordinating all contractors.

Thus, in January of 1967, the Engineer was faced with the problem of trying to bring three contractors (Kiewit, Havens, and Combustion Engineering) back on to schedule, and at the same time, arranging conditions so that the other contractors coming in would also be able to work. Sometimes, contractors coming in were not able to work immediately. The Engineer at all times had to consider its contractual obligation to place the plant into full working operation by May 1, 1968.

24. Starting in September of 1966, when it became apparent that work was falling behind the initial schedule, G–1, the Engineer began making modifications in the construction schedule to adjust to existing conditions. At approximately monthly intervals, Black & Veatch would devise a modified overall schedule which employed a planning technique known as the Critical Path Method (CPM), a method of planning, which, as the name suggests, is designed to assure that the most critical construction work is done in the most expeditious manner, while at the same time assuring that all contractors on the site can proceed with their work in a coordinated manner. Because new problems continually arose on the site, the CPMs became obsolete almost as they were issued. Thus, George Hirt, Black & Veatch's field man, made modifications in scheduling at the site as often as new problems would arise. Sometimes these modifications occurred daily.

Hirt used as his criteria for scheduling: (1) the May 1, 1968 deadline for completion, (2) his previous experience in supervising construction of power plants, and (3) the economic impact of his decisions on all of the various contractors. Hirt initially called weekly meeings of all contractors in which grievances were discussed and schedule modifications were worked out. By winter, however, Hirt decided that the weekly meetings were fruitless, and so

he communicated with each contractor individually from then on.

25. All contractors complained about one another to Hirt. All contractors continuously approached Hirt about obtaining priority at a particular location over the other contractors. Hirt's scheduling decisions did not continuously favor one contractor over another, but were designed to get critical construction work done first. At times, every contractor was forced to obey a disadvantageous (to that contractor) schedule. Phil Harris, Kiewit's job superintendent during the months in question, testified to the Court that Hirt's decisions were impartial.

26. On some occasions, but infrequently, Hirt ordered Kiewit to one area in the morning and to another area in the afternoon, causing Kiewit the inconvenience of moving men and equipment. This, however, was not a significant reason for the problems Kiewit was encountering.

27. Hirt allowed many changes in specifications and scheduling which let Kiewit continue working when it otherwise would not have been able to do so. Kiewit was allowed to pour some slabs out of sequence, to pour in smaller areas than specified, and to block out certain areas to facilitate pouring.

In the early stages, Kiewit had problems in conforming its re-steel work to specifications because it was using the wrong grade of steel and some of the welds were not holding. Hirt allowed some of this work to be merely repaired rather than replaced in order to expedite Kiewit's work. Kiewit also had a problem of getting the water down to the specified level before making a concrete pour. Hirt allowed the pour to be made while the water was at a higher level.

On one occasion, when Kiewit did not have enough lumber on hand to make forms for the pours required by the Engineer's schedule, the Owner, through the Engineer, offered a contract modification to Kiewit in which the Owner would supply more lumber and pay some

additional money if Kiewit would lay concrete in accordance with the schedule proposed by the Engineer. Kiewit refused this offer.

28. Kiewit and other contractors had difficulty getting along with Hirt's assistant at the site, and consequently came to Hirt whenever a problem arose. This complicated the already large problems Hirt was having. Black & Veatch, however, did have adequate and capable personnel at the job site, and the job was not delayed in any manner because of insufficient personnel on the site from Black & Veatch.

29. Kiewit was continually plagued by a labor turnover which slowed down its work.

30. After March of 1967, Kiewit had no further problems at the site and had no further complaints about hindrances or delays.

31. The generating plant was completed and ready for commercial operation June 8, 1968.

32. Kiewit overran its initial labor estimate by more than $65,000 at the completion of the job. It also overran other items of the estimate to some extent, but in many other items, it actually spent considerably less than it had estimated.

Overall, Kiewit had planned on a $300,000 margin above job site costs. It actually made around $99,000 over job site costs.

33. There is no evidence that Kiewit was forced by the Engineer to keep equipment or manpower idle at the job site during any of the delays or stoppages of work encountered from September, 1966 to April, 1967. In other words, there is no evidence that Kiewit needed the equipment or manpower elsewhere, but was forced to keep it idle at Burlington on orders of the Engineer.

34. There is evidence that Kiewit encountered greater interference, from having to jointly occupy the construction areas with other contractors, than was contemplated by the original schedule, G–1. This increased interference was

caused because the delays encountered on the job forced the Engineer to schedule work of more contractors to be done simultaneously.

35. Fossil-fueled power plants are, of necessity, designed compactly because (1) materials, especially piping, are very expensive, (2) manpower to operate the plant is reduced when the plant is compact, and (3) thermo dynamic loss is greater as the plant becomes more spread out. Furthermore, the Burlington plant site itself was of a very limited area. As a result, there was very little working space at the Burlington plant, and much of the work of the various contractors had to be undertaken in approximately the same area.

36. Every contractor was bound by the May 1, 1968 completion date. Iowa Southern could not extend the completion date, because its contracts with outside sources of electrical power expired on that date, and it, therefore, needed the additional power on the line by May 1. Thus Black & Veatch had no viable choice but to require contractors to work in the same area simultaneously after delays began to occur. This joint occupancy caused Kiewit and other contractors to work less efficiently than they would have, had things gone according to G–1.

37. There is evidence that Kiewit incurred some additional expense in having to lay more concrete in the winter than it had originally contemplated.

38. There is no evidence that Kiewit was hindered in any manner because of inadequate plans and specifications for the job.

39. There is no evidence that Kiewit ever made a written request for extension of time which was turned down by the Engineer.

40. The final estimate for the work performed by Kiewit under the construction contract was evidenced by Certificate No. 28, dated March 7, 1969, and showed the amount due Kiewit to be $165,985.73. On April 2, 1969, and again on April 18, 1969, Iowa Southern tendered to Kiewit its check for $165,985.73 and on both of said occasions said check was refused by Kiewit because Kiewit was not willing to accept the final payment and release its claims in accordance with general conditions, section GC–45.

41. Kiewit performed the work under the conditions indicated from August of 1966 through April of 1967 as directed by defendants and Kiewit constantly, indeed almost daily, complained to George Hirt about the working conditions. Nearly all communications between Hirt and Kiewit about schedule modifications and complaints about scheduling were oral.

42. The parties, as shown by plaintiff's Exhibit "7–6" modified the contract requirements set forth in section GC–17, specifying the thirty-day limit for filing notice of objection, and extended until February 1st, 1969, plaintiff's right to file written protest to the Engineer's decision turning down plaintiff's claim, which was dated and filed by plaintiff on May 20th, 1968, and plaintiff complied with this modification.

43. On May 20th, 1968, plaintiff filed its claim for the extra costs involved in the total sum of $327,579.52, and when suit was brought increased this amount to $595,236.00.

44. There is no evidence in the record that Chicago Painting Service, Inc. was in any manner hindered or delayed in performing its sub-contract by any event occurring on the job site or by the Owner or the Engineer. Chicago Painting incurred increased costs because it chose to come on to the site at a late date when labor costs had increased over what it had originally estimated.

## CONCLUSIONS OF LAW

Plaintiff Kiewit's Complaint is in nine counts. Count I is against the Owner alone, and alleges breach of the construction contract by Iowa Southern, Count II is against the Engineer alone, and alleges breach of the contract between Iowa Southern and Black &

Veatch to which Kiewit allegedly was a third-party beneficiary. Count III is against Black & Veatch alone, and is based upon alleged negligence of the Engineer in supervision of the project. Count IV is against both Iowa Southern and Black & Veatch, alleging "active interference" with plaintiff's performance of its contract. Count V is against Iowa Southern and prays for an equitable adjustment of contract price because of alleged contract modifications. Count VI is against Iowa Southern and prays for an equitable adjustment of price because of alleged constructive suspensions of work. Count VII is against Iowa Southern and prays for money owing either because of constructive modifications of contract or constructive suspensions of work. Count VIII is against Iowa Southern and seeks payment of the final estimate of $165,985.73. Count IX is against both Iowa Southern and Black & Veatch, and prays for damages for plaintiff's sub-contractor, Chicago Painting Service, Inc., realleging all of the allegations of Counts I through VIII.

## I.

Plaintiff alleges in Count I that Iowa Southern is guilty of a material breach of its contract with the plaintiff. Clearly, in order for plaintiff to recover upon this theory, it must establish that the construction schedule, G–1, was binding upon Iowa Southern, for there is not a scintilla of evidence that Iowa Southern could have breached the contract in any other respect.

 Viewing the contract documents as a whole, the Court concludes that Iowa Southern did not breach its contract with Kiewit because of the deviations of the actual construction dates from the construction schedule, G–1. Iowa law is clear that in order for time to be of the essence in a contract, there must be express provisions to that effect. In this contract, there is no doubt that the completion date of the power station was of the essence; myriad provisions of the contract so state. As to

the intermediate dates contained in G–1, however, there is no express provision in the contract which makes these dates absolutely binding upon Iowa Southern. The purpose of G–1 is set out in the Special Conditions under the heading "Construction Schedule." Schedule G–1 was intended by the parties to give a basic idea of when the various phases of Kiewit's and other contractors' work should start and how rapidly it should be prosecuted in order for everyone to make the completion deadline of May 1, 1968. The Court also notes sections GC–15, GC–27, GC–34, GC–35 and GC–36 of the General Conditions, which give additional support for the Court's conclusion that this was the intention of the parties with respect to G–1. Section GC–15 of the General Conditions states explicitly that Kiewit was to prosecute its work in such a manner so as to cause the least possible interference with other contractors, and that the Engineer was to decide how the work was to proceed in the event that contractors experienced interference from one another. Considering the contract documents as a whole, the Court concludes that there was no express agreement that schedule G–1 was binding upon Iowa Southern, but rather many items in the documents suggest that Iowa Southern, through the Engineer, could change the schedule as circumstances dictated.

Kiewit had no right, under this contract, to rely upon the dates contained in G–1 as being absolute time periods for construction. The Court does not believe that it actually did so rely. Insofar as Southern Fireproofing Co. v. R. F. Ball Const. Co., 334 F.2d 122 (8th Cir. 1964), is any support at all for either side in this case, the Court believes that its conclusion is in line with that decision. Iowa Southern did not breach its contract with Kiewit and Count I must fail.

## II.

Count II of the Complaint alleges that Black & Veatch is liable to Kiewit because the Engineer breached its contract

for engineering services with Iowa Southern to which Kiewit was a third-party beneficiary. The crux of plaintiff's contention in this Count is found in the following pertinent portion of plaintiff's trial brief at 19:

"As part and parcel of this contract [between Black & Veatch and Iowa Southern], *although not specifically referred to,* Black & Veatch agreed that it would represent Iowa Southern Utilities Co. in preparing and administering these contracts in a manner which is fair and reasonable both to the owner and to the contractor. Clearly, Black & Veatch knew that in the preparation of the bid documents for the general construction contract which was bid upon by Kiewit, they must be careful not to put in any misleading or inaccurate information upon which Kiewit would rely.

"Black & Veatch owed this duty not only to Iowa Southern Utilities Co., but also to Kiewit." (bracketed material and emphasis added by the Court).

█ The Court cannot conclude that Black & Veatch owed such a contractual duty to Kiewit. It is true that Iowa has long ago left the strict rule that only the parties privy to a contract could sue upon it. Iowa Power & Light Co. v. Abild Const. Co., 259 Iowa 314, 144 N.W.2d 303 (1966). It is also clear, however, that in order to have standing to assert a breach of contract, a party not privy to such contract must be regarded as a direct beneficiary to the contract, and not as an incidental beneficiary. That is, he must be regarded as either a donee beneficiary or a creditor beneficiary, as those terms are defined in Restatement, Contracts, Section 133, in order to recover damages flowing from breach of a contract to which he was not a party. Olney v. Hutt, 251 Iowa 1379, 1386, 105 N.W.2d 515 (1960). It cannot be contended that Kiewit is a donee beneficiary, that is, that Iowa Southern intended to bestow a gift upon Kiewit. Accordingly, Kiewit must come within

the concept of creditor beneficiary, or else Count II shall fail.

"One is a donee beneficiary if it appears from the terms of the promise in light of surrounding circumstances 'that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed nor asserted to be due from the promisee to beneficiary'. Olney v. Hutt, supra, 251 Iowa at 1386 [105 N.W.2d 515]. One is a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in accompanying circumstances but 'performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary.' Olney v. Hutt, supra, 251 Iowa at 1386 [105 N.W.2d 515]. One is merely an incidental beneficiary and no rights accrue to him from the contract if he fails to qualify as either a donee beneficiary or creditor beneficiary. Olney v. Hutt, *supra,* 251 Iowa at 1383, 1385, 1386 [105 N.W.2d 515]. See also Johnson Farm Equipment Company v. Cook [8 Cir.], 230 F.2d 119 at 124."

Iowa Power & Light Co. v. Abild Const. Co., 144 N.W.2d at 312.

█ In the contract between Iowa Southern and Black & Veatch, Black & Veatch did not expressly undertake to do anything for Kiewit. There is no direct mention of Kiewit in the contract. There is no language in the contract which could be construed reasonably to show an intent of the parties to confer a direct benefit upon Kiewit. *See* Casey v. Jesup Creamery Co., 224 Iowa 1094, 278 N.W. 214 (1938).

"That the parties must have clearly intended the contract to be for the benefit of the third party to enable him to sue thereon, is one of the most commonly expressed limitations on the rule, * * *. The intent to benefit the third person must clearly appear

from the language of the agreement, in light of the circumstances under which it was entered into." 17 C.J.S. Contracts, § 519(c), pp. 1127, 1128, 1129, and 1130 (1939).

Olney v. Hutt, 105 N.W.2d at 518–519.

"No man will be held liable in law to different parties for the same cause of action. The principle is therefore confined to cases where the person for whose benefit the promise is made has the sole, exclusive interest in its performance."

German State Bank v. Northwestern Water & Light Co., 104 Iowa 717, 722, 74 N.W. 685, 686 (1898); *Olney, supra,* 105 N.W.2d at 519.

The Court cannot conclude that it was the intent of Iowa Southern and Black & Veatch in their agreement of April 10, 1964, to confer a direct benefit upon Kiewit. Counsel for Kiewit has not shown the Court any such provision contained in the contract. The contract clearly indicates that all benefits flowing from Black & Veatch in that contract were to be received by Iowa Southern. That Kiewit would and did receive some incidental benefits from this contract is not enough to make Kiewit a third-party beneficiary under the law.

In this case, Iowa Southern contracted with Black & Veatch; Kiewit contracted with Iowa Southern. If something went wrong, it was clearly the intent of the parties that Kiewit would look to Iowa Southern, and then, perhaps, Iowa Southern would look to Black & Veatch. It was never the intent of the parties, as far as this Court can discern, that Kiewit look directly to Black & Veatch.

The instant situation is distinguishable from that in Giarratano v. Weitz Co., 259 Iowa 1292, 147 N.W.2d 824 (1967). There the estate of a deceased employee of a sub-contractor sued the principal contractor for neglect of duty undertaken by the latter and articulated in its contract with the sub-contractor "to take all necessary precautions for the safety of employees on the work . . .". It is, of course, reasonable to consider that a safety clause is included in a contract *primarily* for the benefit of workers on the project and could be held to create in the worker a right to sue. It is notable that the members of the class were clearly identified as "employees". In the instant action, a much more tenuous relationship exists regarding the intent of the owner to create a right to sue in others.

The Iowa Court has indicated that "a distinction should be drawn between an intent to create a 'right' in a third party and an intent that a performance beneficial to him shall be rendered." Giarratano v. Weitz Co., *supra,* at 1306, 147 N.W.2d at 833; Johnson Farm Equipment v. Cook, 230 F.2d 119, 124 (8th Cir. 1956). The owner intended to confer no right upon Kiewit (or anyone else) as against Black & Veatch because of damages allegedly arising from the project.

Count II must be dismissed.

### III.

In Count III Kiewit alleges that Black & Veatch was negligent in particulars which will be hereinafter discussed.

At the outset, the Court notes certain clauses in the contract between Iowa Southern and Kiewit which gave the Engineer broad discretion in the planning and management of the project. These provisions are contained in the General Conditions at Sections GC–15, GC–17, GC–27, GC–34 and GC–36 and in the Special Conditions under the headings "Construction Schedule," "Contractor's Detailed Schedule," "Delays," and "Protection of Work."

■ Under Iowa law, when the parties (owner and contractor) to a construction contract agree to abide by discretionary decisions of the project engineer, the terms of the contract will be given full force and effect and the parties will be bound by the decision of the engineer.

"It is not for us to inquire whether the construction placed upon the contract by the engineer was right or

wrong, for the reason that the construction placed on it was a construction made by the one appointed to whom the right to determine the intent and meaning of the contract was given, and to make the estimate, and plaintiffs agreed to be bound by his construction."

Nishnabotna Drainage Dist. v. Lana Const. Co., 185 Iowa 368, 373–374, 170 N.W. 491, 492 (1919).

"We hold, therefore, that inasmuch as the parties had a right to make the contract in question, and did, in the contract, provide that the engineer selected should have charge of the detail of the work, the power to construe the contract and to make the estimates according to the construction placed upon the contract by him, his construction and estimates, in the absence of fraud, are binding upon the plaintiffs. . . . "

170 N.W. at 494. The *Nishnabotna* case was followed and extensively quoted in Eastern Iowa Light & Power Coop. v. McKenzie, 296 F.2d 295, 301–302 (8th Cir. 1961).

■ The Engineer's discretionary powers under the contract between Kiewit and Iowa Southern, however, do have limitations. This discretionary power is subject to the implied limitations of reasonableness and the duty to exercise care commensurate with the standards of his profession.

"We think an architect whose contractual duties include supervision of a construction project has the duty to supervise the project with reasonable diligence and care. An architect is not a guarantor or an insurer but as a member of a learned and skilled profession he is under the duty to exercise the ordinary, reasonable technical skill, ability and competence that is required of an architect in a similar situation. . . . "

Aetna Insurance Co. v. Hellmuth, Obata & Kassabaum, Inc., 392 F.2d 472, 476 (8th Cir. 1968). See also Peerless Insurance Co. v. Cerny & Associates, Inc., 199 F.Supp. 951 (D.Minn.1961); United States v. Rogers & Rogers, 161 F.Supp. 132 (S.D.Cal.1958).

■ In addition, the Engineer had the duty of care and competence commensurate with the standards of his profession in obtaining and communicating information for the guidance of Kiewit with respect to its business transactions relating to the Burlington project. Ryan v. Kanne, 170 N.W.2d 395 (Iowa 1969); Restatement, Second, Torts, Section 552.

■ Kiewit urges that Black & Veatch should be held, *vis a vis* Kiewit, to the highest standards of the engineering profession, because of a provision to that effect in the contract between the Engineer and Iowa Southern. As Kiewit is not a third-party beneficiary to that contract, for reasons stated in Division II *supra*, the Court concludes that Black & Veatch did not owe this higher standard of care to Kiewit. Thus, under principles articulated above, the Court must determine whether the Engineer was negligent.

The Court will treat Kiewit's allegations of negligence on the part of Black & Veatch *seriatim*:

■ 1. There is no evidence that Black & Veatch prepared faulty specifications. The only possible complaint Kiewit could have with respect to the specifications is that Havens was not initially bound by schedule G–1. This was because Havens' contract was let before all key materials and equipment could be contracted for. Everyone agrees that it was essential that the steel contract be let as soon as possible in order to give the steel contractor adequate lead time. Accordingly, it could hardly have been an act of negligence for Black & Veatch to have let the steel contract when it did. In fact, Havens was subsequently bound by a schedule compatible with G–1. Had this schedule been met, there would have been no problem flowing from Havens' performance as respects Kiewit. Occurrences beyond the control of the Engineer, and for the most part

beyond the control of Havens, however, caused Havens not to be able to meet its schedule. Black & Veatch tried diligently to bring Havens back on schedule. This cannot be negligence.

2. Kiewit, in the trial of this lawsuit, conceded that the schedule prepared by Black & Veatch was workable. This allegation of negligence is frivolous.

3. Likewise, Kiewit's allegation that the Engineer failed to prepare contract documents, schedules of performance, plans, specifications, and drawings in a manner which would allow an orderly and efficient construction and in accordance with the good and accepted customs and usages of the trade is totally lacking of support in the record. The evidence is that the Engineer did in fact prepare all documents consistent with customs and usages in the trade.

4. There is no evidence that Black & Veatch failed to provide adequate and competent personnel to administer the contract documents on the job site. There is some evidence that the contractors, especially Kiewit, did not get along well with a staff engineer under the supervision of George Hirt, the head engineer in residence at the site. That notwithstanding, the evidence is that Black & Veatch handled the site supervision very efficiently, by coping with potentially disastrous set backs and yet completing the job substantially on time. In fact, the Engineer's efficiency in this regard is one of the matters about which Kiewit most bitterly complains. Black & Veatch certainly was not negligent in this respect.

5. There is no evidence that Black & Veatch administered the contract in any manner other than that accepted by the trade. In the first place, Kiewit put on no evidence but its own self serving declarations as to how a supervising engineer should function. In the larger respect, however, the Court cannot fathom how Black & Veatch could have operated any differently than it did, considering

the circumstances, and still have performed its obligations to the Owner.

6. Under the circumstances, the Engineer adhered, and caused the work to proceed, as closely to Schedule G–1 as was possible. As the Court has concluded in section I herein, G–1 was not absolutely binding on the Owner. Deviations were anticipated by the parties, depending upon the circumstances. All contractors were bound by G–1, or schedules closely approximating it. The circumstances on the site caused the Engineer to order substantial deviations, in some instances, from G–1. The Engineer's actions in this regard, however, were reasonable and were within the contemplation of the contracts of all parties involved.

7. There is no evidence of a failure of the Engineer to properly test and inspect Kiewit's concrete. All problems in this regard were caused either by Kiewit itself or by other contractors, and were not due to any negligence on the part of the Engineer.

8. The Engineer did not fail to give Kiewit reasonable time extensions. The fact is that Kiewit never formally requested any, as required by its contract with Iowa Southern.

9. Kiewit alleges that the Engineer required Plaintiff to work under costly and inefficient circumstances not contemplated by the contract documents. Kiewit did have to work under less than ideal circumstances, but all other contractors also suffered from the same problem. The Court can find nothing in the contract that suggests that the Engineer had to give preference to Kiewit, with respect to working conditions. Rather it was the Engineer's duty to treat Kiewit equitable, considering its similar duty to all other contractors on the site. The Engineer undeniably treated Kiewit the same as all other contractors, giving Kiewit preference when the totality of the job would be advanced by such treatment, and holding Kiewit back when circumstances dictated that

other contractors should be given priority in their work. Kiewit was an experienced contractor; it knew of the possible difficulties and delays which could beset a job such as the instant one. This job had more than its share of difficulties, but the contracts clearly allowed Black & Veatch to do what it did. Black & Veatch would have breached its contract with the Owner, had it done differently. Kiewit was the victim of those circumstances that sometimes construction contractors experience. The fault here was not with the Engineer.

■ 10. As will be shown in more detail in the next section, the Engineer did not unlawfully interfere with the progress of Kiewit's work. Any delays that the Engineer caused Kiewit were done in accordance with the contracts of all contractors, including Kiewit. Certainly there was nothing unlawful or negligent in what the Engineer did at the construction site.

In summary, the Court concludes that Black & Veatch was not negligent with respect to Kiewit in any particular and that Count III should be dismissed.

### IV.

Count IV of the Complaint, against both Iowa Southern and Black & Veatch, incorporates all of the allegations of Counts I, II and III and then asserts that the acts and conduct alleged in those Counts constitute "active interference" on the part of the Owner and the Engineer. Of course, the Court has already stated that Counts I, II and III have failed of proof.

The construction contract between Iowa Southern and Kiewit covering the general construction work on the Burlington Generating Station contains several provisions that, in their totality, constitute a clear and unrestricted covenant on the part of Kiewit that Kiewit will not make any claim, other than for additional time, arising out of any delays in the construction of the generating station. *See* General Conditions GC–15, GC–35 and GC–36 and Special Condition "Delays."

Contract provisions, commonly called "no damages clauses," similar to those contained in the Kiewit-Iowa Southern contract, are obviously conceived by agencies similar to Iowa Southern that are contracting for large and costly improvements on the basis of fixed appropriations or loan commitments, as a protection against vexatious litigation based on claims, real or fancied, that the agency has been responsible for unreasonable delays. See Anthony P. Miller, Inc. v. Wilmington Housing Auth., 165 F.Supp. 275, 281 (D.Del.1958).

■ It is well recognized that when the language contained in no damage clauses, is clear and without ambiguity, such clauses will be regarded as valid, and enforced according to their terms. Wells Brothers Co. v. United States, 254 U.S. 83, 87, 41 S.Ct. 34, 65 L.Ed. 148 (1920); F. D. Rich Co. v. Wilmington Housing Authority, 392 F.2d 841, 842–843 (3rd Cir. 1968); Anthony P. Miller, Inc. v. Wilmington Housing Authority, 165 F.Supp. 275, 281 (D.Del.1958); 5 Corbin, Corbin on Contracts, Section 1068, P. 388 and n. 87 (1964).

■ Further, as stated by the court in Psaty & Fuhrman v. Housing Authority, 76 R.I. 87, 68 A.2d 32, 36 (1949):

"The parties to the contract are free to agree upon any terms that are not illegal. No damage clauses similar to the one under consideration, which are most frequently found in construction contracts especially when they relate to public improvements, are not ordinarily in violation of law. We concede that such a clause if unambiguous calls for strict application but it cannot be treated as meaningless and futile, as the contractor attempts to do in the instant cases."

. . . . .

"If a party to a contract with such a clause acts honestly within the fair and legal import of its terms, he cannot be deprived of the benefit thereof unless his conduct indicates bad faith or some other tortious intent, as every

contract implies fair dealing between the parties."

■ There are, however, certain exceptions to the general rule of validity and enforceability recognized under circumstances not present in this cause. In general terms, a contractor may recover for unreasonable delays in the construction process notwithstanding the presence of "no damage" clauses, if the delay: (1) was of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, (3) was caused by bad faith, or (4) was caused by active interference. See e. g., F. D. Rich Co. v. Wilmington Housing Authority, *supra*, 392 F.2d at 843; Anthony P. Miller, Inc. v. Wilmington Housing Authority, *supra*, and American Bridge Co. v. State, 245 App.Div. 535, 283 N.Y.S. 577, 578, 582 (1935).

■ Of the four above-articulated exceptions to the general rule of validity and enforceability of "no damage" clauses, the first three are self-explanatory. The fourth exception, "active interference", has not attained any precise judicial description. A review of the relevant cases, however, indicates that the term clearly connotes a type of conduct more reprehensible than complained of by the plaintiff herein. American Bridge Co. v. State, *supra*; Taylor-Fichter Steel Const. Co., Inc. v. Niagara Frontier Bridge Commission, 261 App. Div. 288, 25 N.Y.S.2d 437, 442 (1941); Cunningham Brothers, Inc. v. City of Waterloo, 254 Iowa 659, 664, 117 N.W.2d 46, 49 (1962).

By illustration, in American Bridge Co. Inc. v. State, *supra*, the defendant, State of New York, had ordered Plaintiff to proceed with the fabrication of structural steel notwithstanding the fact that Plaintiff knew it would be many months before essential preliminary construction work could be completed. As a result of the premature fabrication order, Plaintiff incurred unwarranted and unanticipated storage expenses and was forced to repaint the stored steel which had become rusted.

In holding Defendant's active interference permitted recovery notwithstanding the existence of a "no damage" clause, the court stated that defendant's order to proceed was unreasonable and the cause of Plaintiff's damage. The court made it quite clear that no damages were awarded because of the delay in the preliminary work caused by another contractor.

In a related case, Taylor-Fichter Steel Constr. Co. v. Niagara Frontier Bridge Com., 261 App.Div. 288, 25 N.Y.S.2d 437, aff'd without op. 287 N.Y. 669, 39 N.E.2d 290 (1941), a "no damage" provision in the construction contract specified, *inter alia*, that an extension of time was plaintiff contractor's only remedy for delay. The provision was held to preclude recovery of damages by the super-structure contractor for delay caused by the substructure contractor, since the extension of time, which was granted, was the only remedy available under the contract, even though the contractee had failed to grant a postponement of the work as requested by the contractor, such refusal not constituting an unlawful interference with the work of the contractor. In this regard the court said:

"Undoubtedly there was implied in a contract of this nature an *obligation* on the part of defendant (the contractee) that it would not do anything that would unreasonably interfere with the opportunity for plaintiff (the contractor) to proceed with its work in the manner provided by the contract, and to permit plaintiff to carry on that work with reasonable economy and dispatch. This, however, does not mean that such an implied covenant would create a liability on the part of defendant based upon claimed interference merely because there was delay by another contractor employed by the defendant. The contract had express provisions as to what plaintiff's rights were to be in case of delay, and no room was left for implication."

In refusing to permit the question of unlawful interference to go to the jury the court said:

"The engineers had obtained assurance from the sub-structure contractor that it would meet a schedule which varies but slightly from the original schedule dates. Assuming that the view that this promise of the sub-structure contractor would be performed was an optimistic one, we fail to see that this would amount to an interference. The engineers were not required to concede at that time that some delay in the progress of the work would prevent fulfillment of the sub-structure contractor's promise. Considering all the circumstances, the matter was solely one of judgment, and the fact that it developed that a somewhat longer time was required than expected would amount, at most, to a mistake in the exercise of judgment, but would not amount to an interference. Defendant's engineers were not required to do anything more than refrain from unreasonably interfering with the progress of the work of the plaintiff. They were entitled to use every effort to obtain complete performance by both contractors. They had the interests of the defendant to protect, as well as those of the plaintiff.

"To permit a jury in a court of law to say that the action of the defendant's engineers amounted to interference in this situation would be depriving those officers of all discretion, and substituting the judgment of the court for that of the contracting parties."

The case of Anthony P. Miller, Inc. v. Wilmington Housing Authority, 165 F. Supp. 275 (D.Del.1958) also deserves special mention. Therein, in a marked similarity to the instant action, the plaintiff had pled causes of action for recovery due to delays in the construction process, both in tort and in contract. The court noted that in order for plaintiff to recover in tort, the plaintiff must prove that the delays charged in the complaint were the product of fraud,

evil intent, improper motive or willfulness amounting to bad faith. *Id.* at 283.

With this brief additional survey of the law of other jurisdictions, it is imperative to ascertain the position of the Iowa courts as to the validity of "no damage" clauses, as the validity of the contract between Iowa Southern and Kiewit, in whole and in part, as well as matters concerning its performance or lack thereof, are governed by the laws of the State of Iowa. Acme Feeds, Inc. v. Berg, 231 Iowa 1271, 4 N.W.2d 430 (1942); E. W. Bliss Co. v. Struthers-Dunn, Inc., 291 F.Supp. 390 (S.D.Iowa 1968).

Initially, the Court notes Iowa Rule of Civil Procedure 344(f), which reads in part:

"The following propositions are deemed so well established that authorities need not be cited in support of any of them . . .

(14) In the construction of written contracts, the cardinal principle is that the intent of the parties must control; *and except the cases of ambiguity, this is determined by what the contract says.*" (Emphasis added)

In addition to, and in connection with I.R.C.P. (f)(14), the Iowa Supreme Court has consistently recognized the validity and enforceability of "no damage" clauses. Hallett Construction Co. v. Iowa State Highway Commission, 261 Iowa 290, 296, 154 N.W.2d 71, 74–75 (1965); Cunningham Brothers, Inc. v. City of Waterloo, 254 Iowa 659, 664, 117 N.W.2d 46, 49 (1962); Cf. McNulty v. Stearns, 85 Iowa 437, 440, 52 N.W. 357 (1892).

The *Cunningham* case merits discussion, in that it would appear to be dispositive of Count IV and preclude the recovery of any damages by the plaintiff herein. In *Cunningham*, the parties had contracted for the construction of two parking ramps in Waterloo, Iowa. As in the instant action, the plaintiff therein was seeking to recover for additional expenses incurred due to delays in the construction process allegedly caused by the

defendant. Specifically, the construction site was not made available to plaintiff at the time originally contemplated by the parties, as demolition, being done by another contractor, was not properly completed. The defendant, City of Waterloo, relied on paragraph 11 of the contract executed by the parties, which read as follows:

"The Second Party (contractor) shall have no right of action against first party (City of Waterloo) on account of delay in prosecution of work, but if said work is delayed by first party, second party shall have such extra time for the completion of the job as was lost by reason of the delay caused by first party."

254 Iowa at 662, 117 N.W.2d at 48.

In ruling on the enforceability and validity of the above quoted contract provision, the court stated that such "no damage" clauses are generally recognized as valid, but, due to the harsh results produced thereby, are strictly construed. 254 Iowa at 664, 117 N.W.2d at 49. The court then immediately made a further statement of direct application to the instant action:

"However, where it clearly appears that the contracting parties have so contracted, the same is recognized, allowing the chips to fall where they may." *Id.*

In apparent consistency with the decisions in other jurisdictions previously discussed, the court in *Cunningham* noted that "no damage" clauses will "not be enforced where the delay is the result of fraud or active interference on the part of the one who seeks the benefits thereof; or the delay is of such a duration as to justify the contractor in abandoning the contract." *Id.*

The first two exceptions to the general rule above stated are easily disposed of. Certainly the plaintiff herein would have to concede that no common law fraud has been perpetrated upon it and none has been alleged. Further, any delay in the construction process was not of sufficient duration to constitute an abandonment of the construction contract. Moreover, no reference is made in any portion of plaintiff's complaint to a justifiable abandonment.

The term "active interference," the third exception to the validity of a "no damage" clause, recognized by the court in *Cunningham,* is a bit unclear and the conduct the term embraces is nowhere fully described in any Iowa Supreme Court case. In attempting to construe the term the *Cunningham* court defined "interference," as it appears in Websters Third International Dictionary, as meaning: "To come in collision; to clash, also to be in opposition; to run at cross-purposes." Taking this analysis adopted by the Iowa Supreme Court one step further, Websters New International Dictionary defines the term "active" as meaning *inter alia*: "Causing action or change; characterized by change; opposed to passive." Further, the term "active," by its common usage, certainly implies some degree of aggressiveness or commission. It, therefore, would appear that to be guilty of "active interference" in the instant action, the defendants herein would have to have committed some affirmative, willful act, in bad faith, to unreasonably interfere with plaintiff's compliance with the terms of construction contract. This Court concludes that the use of the term "active" to modify "interference" by the Court in *Cunningham* was intentional, is significant, and clearly implies that more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence is needed for plaintiff to prove the "active interference" necessary to render unenforceable an otherwise clear and unambiguous "no damage" clause. See e. g. American Bridge Company v. State, 245 App.Div. 535, 283 N.Y.S. 577, 578, 582 (1935); Taylor-Fichter Steel Const. Co. Inc. v. Niagara Frontier Bridge Commission, 261 App.Div. 288, 25 N.Y.S.2d 437, 442 (1941); Anthony P. Miller, Inc. v. Wilmington Housing Auth., 165 F.Supp. 275, 281 (D.Del. 1958).

The Court concludes that no active interference has been committed by the defendants in the instant action. Indeed, plaintiff and defendants shared the same common goal, to-wit: that the construction proceed to full and prompt completion. At most, there may have been some neglect and delay on the part of the steel contractor, but such neglect and delay does not rise to the level of being "active interference by the defendants," and is covered by the contract provisions designated GC–15, GC–35, GC–36 and SC–Delays.

The contract for structural steel was entered into before the schedule denominated G–1 was prepared. Nonetheless, defendants did in fact bind the structural steel contractor, Havens, to the same starting and completion dates as specified in G–1. Further, the structural steel contractor also submitted an interim construction schedule, relied on by defendants, that was and is compatible with G–1. And, as the Court has previously concluded in Division I, *supra*, the schedule was not absolutely binding upon Iowa Southern and the Engineer in any event.

■ One last aspect of the *Cunningham* decision is important to note. The defendant therein had alleged the "no damage" clause applied only to such delays as were contemplated by the parties, and failure to make the construction site available to plaintiff on the date originally contemplated, due to the inadequate demolition work by another contractor, was not so contemplated. 254 Iowa at 664–665, 117 N.W.2d at 49. The Iowa court disagreed, stating that failure to have the site available on the commencement date was contemplated by the parties, in that the contract noted that "any delay" caused by defendant would entitle plaintiff to an extension of time. The Court notes that provisions GC–15, GC–35 and GC–36 of the instant contract provide, in effect, the same thing. The *Cunningham* court went on to note:

"Delays that are known or expected to happen would ordinarily be considered in the fixing of the dates for starting and completing the work. It is for the purpose of providing for situations that may perchance arise that the provision for extension of time is included."

254 Iowa at 665, 117 N.W.2d at 49. This passage is likewise applicable to the instant action.

It is interesting to note that the court in *Cunningham* indicated it still might have awarded the plaintiff damages, were it not for paragraph 11 of the contract, which stated in part that plaintiff would have no cause of action against the defendant on account of delays in the prosecution of the work. The court stated, in regard to paragraph 11:

"While the application of such restriction may appear harsh, such was the contract entered into by the parties and we see no valid reason why it should not be enforced."

234 Iowa at 665, 117 N.W.2d at 50. Again, the Court notes the similarity between the aforesaid paragraph 11 and the provisions of the contract between the parties to this litigation, designated GC–15, GC–35 and GC–36.

The contract between the parties to this litigation is clear and unambiguous, and the often-quoted provisions of GC–15, GC–35, GC–36 and SC–Delays clearly limit any claim by plaintiff, due to delay in construction, to an extension of time. There has been no active interference on the part of the defendants. Had defendants caused any of the work affecting Kiewit to be done in a faulty or unacceptable manner, or had the defendants caused Kiewit to work when such work was not necessary, at such time and in such manner, to the proper and expeditious completion of the project, this Court might be justified in finding active interference. Such is not the case. Moreover, plaintiff did not follow the contract mechanisms and did not make timely request, in writing, for an extension of time, but now seeks reimbursement after the project has been completed. The plain implication of such a

course of conduct is that plaintiff realized it was to bear the expenses due to any delays in construction, and further confirms the fact that the "no damage" clauses should be given full effect.

Finally, the Court notes Lichter v. Mellon-Stuart Co., 305 F.2d 216 (3rd Cir. 1962). In *Lichter,* the court held that even if the "no damage" clause were applicable only to the damages resulting from delays alone, the plaintiff could not recover because in the evidence there had been no attempt to segregate the damages which were occasioned by delays from those which were occasioned from other causes. Even if the "no damage" clause in this case only applies to "delays," and the Court concludes that it is not so limited, the Court would find it nearly impossible from this record to make any division of damages between those barred by the "no damage" clause and those not so barred.

For each and every one of the above reasons, Count IV must be dismissed.

## V.

Counts V, VI and VII are against Iowa Southern only.

Count V of the complaint incorporates the factual allegations of Count I, and then alleges that the acts of the owner in modifying or abandoning Schedule G–1 "was a change in the contract for which plaintiff is entitled to recover an equitable adjustment of the contract price."

Count VI of the complaint incorporates the factual allegations of Count I of the complaint, and then alleges that the plaintiff was "prevented or delayed by the Owner from working," was ordered not to do certain portions of its work which would have been performed as contemplated by the contract and schedule G–1, and was ordered by the owner not to work in certain areas; and plaintiff then alleges that these orders not to work "were constructive suspensions of plaintiff's work" for which plaintiff is entitled to recover damages "by way of equitable adjustment."

Count VII of the complaint incorporates the factual allegations of Count I, and then alleges that the acts of the owner resulted in the plaintiff being compelled to perform additional and extra work; and that the acts of the owner "in abandoning or modifying construction schedule G–1 and directing plaintiff to proceed as it did" resulted in additional and extra work not contemplated by the contract; and that plaintiff is entitled to be paid for this work resulting from either, or both, the constructive modification of the contract or the suspension of work.

As stated in United States v. Utah Construction and Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966):

"The typical construction contract between the Government and a private contractor provides for an equitable adjustment of the contract price or an appropriate extension of time, or both, if the government orders permitted changes in the work or if the contractor encounters changed conditions differing materially from those ordinarily anticipated."

Footnote 1 on pages 397–398, 86 S.Ct. 1545 quotes the language of a typical government contract which permits an "equitable adjustment." The opinion of the Supreme Court also points out that the typical government contract contains a "disputes" clause, a form of which is quoted on page 399, 86 S.Ct. 1545.

See also United States v. Carlo Bianchi and Company, Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1964) for a discussion of similar provisions in government contracts.

The construction contract in this case between Iowa Southern and Kiewit contains no such provisions, and since no such provisions are contained in the contract, the Court concludes that there can be no legal basis shown under the record in this case for an "equitable adjustment" of the contract price.

Where a claim is made for an "equitable adjustment" under a government

contract, it is considered to be a case "arising under the contract." See the opinion of the Court of Claims in Utah Construction and Mining Co. v. United States, 339 F.2d 606, 168 Ct.Cl. 522 (1964). The difficulty with the assertion of these claims in this case is that the construction contract here does not contain any provision authorizing an "equitable adjustment" similar to the provisions found in typical government construction contracts.

■ Furthermore, the evidence here does not show any modification or abandonment of the construction schedule or any "constructive suspensions of plaintiff's work" or any proof of "additional or extra work" for which the plaintiff can be entitled to recover under the terms of the contract. The "no damage" provisions of the contract are, again, applicable, in any event, to bar any recovery by the plaintiff on the theories pleaded in Counts V, VI, and VII. There is no proof of any order by Black & Veatch suspending Kiewit's work under GC–27 and, on the contrary, the undisputed evidence is that no such suspension order was ever issued. Likewise, there is no proof of any "extra work," as described in GC–22.01. It will be noted also that GC–22.01 provides, expressly, that the contractor shall not have a right to maintain an action in court to recover for extra work "unless · his claim is based upon a written order from the Owner." Again, it is undisputed that in this record no such orders for extra work were ever issued.

Counts V, VI and VII must be dismissed.

## VI.

In Count VIII of the complaint Kiewit asks judgment against the Owner for the final estimate, in the amount of $165,985.73. The pleading asserts that Kiewit is entitled to judgment for that amount, together with interest from November 10, 1968. The facts with reference to this claim are set out in the motion for summary judgment filed herein by plaintiff on or about October 16,

1969, and in the sworn "statement in response to request for admissions" by R. F. Brewer, then vice-president of Iowa Southern Utilities Company, attached thereto; and in the resistance of Iowa Southern Utilities Company to the motion for summary judgment, filed herein on or about October 30, 1969; and in the Court's memorandum and order overruling the motion for summary judgment, dated December 24, 1969, and filed herein on December 29, 1969.

The letters attached to Mr. Brewer's statement in response to request for admissions show that on April 2, 1969, Iowa Southern tendered to Kiewit the $165,985.73. Under date of April 8, 1969, Kiewit responded by letter, asking Iowa Southern to waive the requirement that acceptance of the check would constitute a release of all claims. Under date of April 17, 1969, Kiewit, with a letter, returned the check, and refused to accept it. By letter dated April 18, 1969, Iowa Southern again tendered the check and expressly denied any liability for interest on the last payment, and stated that the contract modification agreement dated November 8, 1968 extended the payment date, in any event, to March 15, 1969. Under date of April 23, Kiewit again returned the check to Iowa Southern.

Thus, the amount of the final estimate, the certificate for which is No. 28, and is dated March 7, 1969, as shown by exhibit 1A attached to Mr. Brewer's statement, was twice tendered to Kiewit, and twice refused.

Section GC–45 of the contract reads:

*"RELEASE OF LIABILITY.* The acceptance by the Contractor of the last payment shall be a release to the Owner and every officer and agent thereof from all claims and liability hereunder for anything done or furnished for, or relating to the work, or for any act or neglect of the Owner or of any person relating to or affecting the work."

■ The Court concludes, therefore, that Count VIII should be dismissed

without prejudice to the right of Kiewit to assert its claim for the final payment at such time as it is willing to accept the payment under the conditions provided by the contract.

## VII.

Count IX of the Complaint seeks judgment against the defendants for alleged increases in the cost of work done by Kiewit's subcontractor, Chicago Painting Service, Inc. This Count incorporates by reference most of the allegations contained in Counts I through VII. Kiewit submitted no evidence on this claim; rather, the claim was prosecuted by Chicago Painting itself.

The Court finds that Count IX must fail for all of the reasons Counts I through VII failed, and for the following additional reasons:

1. Chicago Painting Service, Inc. was a subcontractor of Kiewit, and had no contract with Iowa Southern, and no connection with Black & Veatch except through Kiewit.

2. Any claim that Chicago Painting Service might have had was waived because it was admitted that Chicago Painting Service gave Kiewit a complete release and lien waiver.

3. The testimony and evidence offered by Chicago Painting was wholly insufficient to show either any cause of action, or any proper measure of damage.

4. George Hirt testified that, in fact, there were no delays with reference to Chicago Painting; that said firm could have done its painting in the winter of 1967–1968. This testimony was not disputed and affirmatively shows that Chicago Painting Service was not delayed by either Black & Veatch or Iowa Southern.

Count IX of the complaint should be dismissed.

## VIII.

In summary, under the record in this case, the Court concludes that:

1. The plaintiff has failed to prove that there were any delays or interference with the work of the plaintiff in violation of the construction contract which entitle plaintiff to recover additional compensation or damages as against either the Owner or the Engineer.

2. The plaintiff has failed to sustain its burden of proving any negligence on the part of the Engineer, as alleged in the complaint, which would entitle the plaintiff to recover damages or extra compensation from either the Owner or the Engineer.

3. There is insufficient proof of any changes or modifications in the contract or constructive suspension of the work or extra work, as alleged in the Complaint, to entitle the plaintiff to recover either damages or extra compensation from the Owner.

4. That, in any event, the claims of the plaintiff are barred by the "no damage" provisions of the contract and the related agreements of the parties.

Accordingly, the Court will enter judgment dismissing the causes of action pleaded in Counts I through VII, inclusive, and in Count IX; and will dismiss Count VIII, the claim for the amount of the final estimate, without prejudice to the right of the plaintiff to make claim for said amount at such time as plaintiff is willing to accept payment thereof and release the owner from all claims and liability, as provided in the contract. Costs shall be taxed to the plaintiff.

It is ordered that the foregoing shall constitute the Findings of Fact, Conclusions of Law, and Order for Judgment in this case in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.