CUNNINGHAM BROTHERS, INC., appellee, v. CITY OF WATERLOO, appellant.

No. 50601.

(Reported in 117 N.W.2d 46)

SEPTEMBER 18, 1962.

REHEARING DENIED JANUARY 15, 1963.

Charles J. Pickett, of Waterloo, for appellant.

Swisher, Cohrt, Swisher, Finch & McCann, of Waterloo, for appellee.

HAYS, J.—Plaintiff contracted with defendant for the construction of two parking ramps. One located on the east side of the City and one on the west side, referred to as the East Ramp and the West Ramp. The contract was for the lump sum of $1,024,000. The Ramps were completed in June 1958 and the contract price together with the cost for certain extra work has been paid by the defendant.

In this action plaintiff seeks recovery for expense incurred for sheetpiling work in connection with the West Ramp; and for

additional expense in providing heat for both Ramps, made necessary by alleged delays in the construction work by defendant. Upon completion of the testimony a motion for a directed verdict, as to each item claimed by plaintiff, was overruled and a jury returned a verdict for plaintiff upon each item. Thereafter, defendant's motion for judgment notwithstanding the verdict was sustained as to each claimed item, as they applied to the West Ramp, and overruled as to the item claimed for the East Ramp. Defendant has appealed and plaintiff filed a cross-appeal.

I. We will first consider defendant's appeal which is concerned only with the East Ramp. The basic issue involves a so-called "no damage" clause appearing in the contract.

The contract, by reference, includes the various documents upon which plaintiff's bid was based. We call attention to various provisions of the contract, and other included documents, which have a bearing upon the matter.

Par. 1, Instructions to Bidders, requests all bidders to examine the plans and specifications, site of construction, Notice to Contractors, form of Proposal and Form of Contract, and if there is any doubt as to the meaning of any part thereof, to have the same fully explained before making a proposal.

Par. 18, Section A, General Specifications, Contract Period, includes the beginning date to the completion date unless the period is extended, in which event the contract includes the new date of completion.

Par. 8, Section B, General Specifications, states that the City shall provide the lands upon which the work under the contract is to be done.

Par. 10, Section B, General Specifications, states that when work being carried on by the City or other contractors is contiguous to work covered by this contract, the rights of such various interests are to be established by the City engineer.

Par. 3, Section C, General Specifications, authorizes the engineer to stop work when necessary to insure proper execution of the contract.

Par. 9, Section C, General Specifications, provides that the

contractor shall provide and pay for all facilities necessary for execution of the contract.

Par. 1, Section D, General Specifications, requires the contractor to complete any portion of the work in such order as the engineer may direct.

Par. 4, Section D, General Specifications, provides *"If the contractor be delayed* in the completion of the work by an act of neglect of the City or its employees; or by any other contractor employed by the City; * * * or by strikes, lockouts, fire, * * * unavoidable casualties, or any cause beyond the contractor's control; * * *, or by any cause which the engineer shall decide justifies the delay, then *the time* of completion shall be *extended* * * * as the engineer may decide *will compensate for such delay."* (Italics ours.)

Par. 5, Section D, General Specifications, authorizes the engineer to suspend the work, wholly or in part, for such periods of time as he may deem necessary, due to unsuitable weather or other conditions.

Par. 1, Section 1, Detailed Specifications, provides that the contractor shall be responsible for any damage to any part of the work or to any adjacent structures by failure of the walls of the excavation.

Par. F, Special Provisions, states: In the event that *temporary heat is required* for the protection of the work during any period of construction, *it shall be the responsibility of the General Contractor* to provide the heat required.

Par. 2, Contract, requires contractor to furnish at its own cost and expense all necessary materials and labor for said work.

Par. 5, Contract, states the work shall start May 1, 1957, and be completed November 30, 1957, *unless an extension of time is granted.*

Par. 11, Contract, provides: "The *Second Party* [contractor] *shall have no right of action against first party* [City] *on account of delays* in prosecution of work, *but* if said work is delayed by first party, second party *shall have such extra time* for the completion of the job *as was lost* by reason of the delay caused by first party." (Italics supplied.)

Par. 18, Contract, states: "This contract is not divisible,

but in the event of a conflict between this contract and the various instruments incorporated by reference, this contract shall govern."

II. The facts so far as material: Plaintiff was ready to start work May 1, 1957. The premises, at the time of contracting, contained buildings which were to be demolished, which work was done by an independent contractor. Plaintiff commenced work on West Ramp, May 13, 1957, at which time the demolition crew had finished on that ramp. June 6, 1957, a wall adjacent to construction site collapsed killing two of plaintiff's workmen. Apparently due to this accident, plaintiff examined the East Ramp where buildings were to be demolished and some buildings stood adjacent to the building site. Plaintiff refused to start work on East site until it was certified safe by an independent engineer. Two different engineers examined it and made reports. Certain precautions were suggested to stabilize adjacent buildings, which work was done by an independent contractor presumably at the defendant's expense. Not until July 29, 1957, did plaintiff commence work at the East site, when the demolition crew had completed its work. It appears without dispute that for some time prior to that date, the demolition contractor was working at one end of the site and plaintiff could have commenced work without any interference thereto on account thereof. This was suggested by the engineer for the defendant and refused by plaintiff. Plaintiff's position was that an agreement to provide a site requires that such site be cleared and made safe in the judgment of the plaintiff, i.e., that no other contractor be working thereon. How much time elapsed because of plaintiff's position does not appear. There is evidence that had plaintiff started work on May 1, 1957, the starting time under the contract, it could have been finished by November 30, 1957, as per contract. Plaintiff requested and received two extensions of time in which to complete the work. It is clear that plaintiff was at considerable expense in furnishing heat for winter work made necessary by the delays in starting work.

III. Defendant relies upon Par. 11 of the contract, supra, as a defense to this action. The plaintiff recognizes such a provision in the contract but seeks to avoid it by two propositions:

(1) Failure to make the site available on May 1, 1957, constitutes intentional actual interference with the plaintiff's work; and (2) such contract clause applies only to contemplated delays and the instant delays were not so contemplated.

IV. The general rule appears to be that a "No Damage" clause in a contract is valid, but, due to the harsh results often induced thereby, will be strictly construed. However, where it clearly appears that the contracting parties have so contracted, the same is recognized, allowing the chips to fall where they may. Volume 9 Am. Jur., Building and Construction Contracts, 1962 Cumulative Supp., pages 14, 15; Annotation, 115 A. L. R., pages 65, 77; Annotations, 10 A. L. R.2d 801. While this court does not appear to have directly considered the question, it is indicated in McNulty v. Stearns, 85 Iowa 437, 52 N.W. 357, that such a clause would be recognized. The rule also appears to be that such clause will not be enforced where the delay is the result of fraud or active interference upon the part of the one who seeks the benefits thereof; or the delay is of such a duration as to justify the contractor in abandoning the contract. See authorities above cited.

V. Appellee asserts and contends that the failure of the appellant to provide, or make available to it, the site so that it might immediately start work constitutes active interference upon its part. According to Webster's International Dictionary, Interfere means "to come in collision; clash; to be in opposition; to run at cross-purposes". A close scrutiny of the record fails to reveal a single act or word by appellant tending to show such an interference. In fact it clearly appears there was a constant desire upon appellant's part that the project proceed to prompt completion and full cooperation upon appellant's part. The best that can possibly be said in support of appellee's contention is that there may have been some neglect upon the City as to the demolition work, or, and perhaps more applicable to the instant case, neglect and delay upon the part of the demolition contractor. Such a delay is specifically mentioned in Par. 4, Section D, General Specifications, supra, and appears also to be covered by Par. 11 of the Contract, supra.

VI. Appellee also attempts to eliminate the "No

Damage" clause by contending that such clause refers only to such delays as were contemplated by the parties and that the delay in making the site available was not so contemplated. Was the failure of the appellant to make the site available to appellee on the commencing date such as was contemplated by the parties? We think it was. It will be observed that the contract, and included documents, specifically provide that *any delay* upon the part of the appellant, or other contractors, shall entitle appellee to such an extension of time as will compensate for such delay. Delays that are known or expected to happen would ordinarily be considered in the fixing of the dates for starting and completing the work. It is for the purpose of providing for situations that may perchance arise that the provision for extension of time is included. We think it is clear that the failure to make the site available, assuming such to be the case, comes within the purview of the parties and entitled appellee to an extension of time. This it received, in fact, two of them. There was full compliance with the provisions of the contract in this respect. If the instant contract contained no further provision relative to delays we might hesitate to refuse appellee damages in addition to the extension of time. See State v. Feigel, 204 Ind. 438, 178 N.E. 435; Edward E. Gillen Co. v. John H. Parker Co., 170 Wis. 264, 174 N.W. 546; Del Genovese v. Third Ave. R. Co., 162 N. Y. 614, 57 N.E. 1108; Guerini Stone Co. v. P. J. Carlin Constr. Co., 248 U. S. 334, 39 S. Ct. 102, 63 L. Ed. 275.

Par. 11, Contract, goes further and provides, in addition to an allowance of additional time, that *appellee shall have no right of action* against appellant *on account of delays* in prosecution of the work. This provision was known and subscribed to by appellee. While the application of such restriction may appear harsh, such was the contract entered into by the parties and we see no valid reason why it should not be enforced. See Allen v. Melrose, 184 Mass. 1, 67 N.E. 1060; First Sav. & Tr. Co. v. Milwaukee County, 158 Wis. 207, 148 N.W. 22; City of Orlando v. Murphy (C. C. A. 5th), 84 F.2d 531.

Under this record there is a complete lack of proof such as to eliminate the application of Par. 11 of the Contract and appellant's motion for a directed verdict and later, its motion for

judgment notwithstanding the verdict should have been sustained.

VII. Turning now to appellee's cross-appeal which concerns only the West Ramp: The trial court sustained appellant's motion for judgment notwithstanding the verdict for expense for winter heating on the West Ramp due to delays alleged to be due to acts of appellant. The identical questions considered on appellant's appeal, supra, are involved here. In view of our holding relative to appellant's appeal, nothing more need be said. The ruling of the trial court was correct.

VIII. The trial court sustained appellant's motion for judgment notwithstanding the verdict for expense in connection with the placing of sheetpiling along Memorial Court, which was adjacent to the site of the West Court.

The record shows that, contrary to the data set forth in the plans and specifications, considerable more excavation work was required along the Court in order to have a suitable base for the foundation. Two methods were available for making this deep excavation along the Court: (1) Opencut this excavation, that is, slope the banks back so they will be stable and not slide into the hold, and (2) drive sheetpiling along the edge of Memorial Court, thus supporting the earth thereunder in a vertical plane. The opencut was the least expensive and was selected by appellee after the appellant authorized the closing of the Court to traffic. After work by the opencut plan was started, a city water main, located some four feet from the site of the ramp, was uncovered. This necessitated the abandonment of the opencut method and the use of sheetpiling to hold the wall of the excavation. In the plans and specifications no sheetpiling is called for at this particular place. All added cost to appellee on account of the extra excavation, or additional earth to be moved because of a lack of a firm base for the foundation, has been paid to appellee as extra work. The cost of sheetpiling was denied. The burden was upon appellee to show such sheetpiling work was "extra work" within the terms of the contract.

Relative to this issue, the contract, and included documents, provided:

Par. A, Special Provisions, requires contractor to furnish

all labor, equipment and perform all operations in connection with the construction.

Par. J, Special Provisions, states that where ground profiles, soil borings, underground utilities, buildings or other existing structures are shown on plans, they are believed to be accurate but not guaranteed to be such. The contractor must satisfy himself relative thereto.

Par. 3, Section B, General Specifications, makes it the duty of the contractor to satisfy himself as to all matters which can, in any way, affect the work under the contract.

Par. 9, Section C, General Specifications, makes it the duty of the contractor to provide and pay for all materials, labor, tools, equipment and other facilities necessary for execution of the work.

Par. 3, Section E, General Specifications, provides that if extra work is required the contractor shall be paid the reasonable cost of the labor and materials *entering permanently* in such work, plus fifteen percent of the cost.

Par. 2, Section F, General Specifications, holds the contractor responsible for all damage done to water, sewer, drain and other underground pipes and to sidewalks and private property.

Par. B, Section 1, Detailed Specifications, states: "This contractor shall provide all sheeting and bracing required to hold the walls of the excavation and for the protection of all adjacent structures. The contractor shall be held responsible for any damage to any part of the work or to any adjacent structures by failure of the walls of the excavation."

IX. It appears that the provisions of the contract, above mentioned, are clear and unambiguous; that if taken in their usual meaning, it would appear that sheetpiling required to stabilize *any* excavation necessary in the construction work was contemplated and included in the contract price. Furthermore, the record shows that sheetpiling does not become a part of the permanent structure but is rented for use as needed. Such would appear to be specifically excluded, as "extra work," for which additional pay is allowed by Par. 3, Section E, General Specifications, supra.

Appellee, however, asserts that by a general custom in this

field, the limit of contractor's responsibility for sheetpiling is only for that appearing in the plans and specifications or reasonably inferred therefrom. Such a construction is clearly contrary to the specific wording of Par. B, Section 1, Detailed Specifications, supra, and which also further requires that the contractor shall make such excavations in any types of material encountered as are required for the construction of the improvement.

 The general rule of construction of contracts, including building construction contracts, is that where the intent of the parties is expressed in clear and unambiguous terms in a written contract the court is bound by such terms. The principle that, when the terms of an agreement have been intended in a different sense by the parties, that sense is to prevail against either party in which he had reason to suppose the other party understood it, has no application to contracts couched and framed in plain and unambiguous words. Comptograph Co. v. Burroughs Adding Machine Co., 179 Iowa 83, 159 N.W. 465; City of Des Moines v. City of West Des Moines, 244 Iowa 310, 56 N.W.2d 904; Huntsman v. Eldon Miller, Inc., 251 Iowa 478, 101 N.W.2d 531. We think the instant contract, as to its meaning, was for the court to determine as a matter of law. In sustaining part of the motion for judgment notwithstanding the verdict it held there was a failure of proof by appellee, in its claim that evidence of a so-called custom, relative to the use of sheetpiling, should prevail over the plain words of the contract. The decision of the trial court was correct.—Reversed upon appellant's appeal and remanded with directions to enter a judgment for appellant notwithstanding the verdict; affirmed on appellee's cross-appeal.

All JUSTICES concur except THORNTON, J., who takes no part.