CLINTON FEDERAL SAVINGS & LOAN ASSOCIATION, Pioneer Federal Savings & Loan Association, Mississippi Valley Savings & Loan Association, Peoples Savings & Loan Association, Independence Federal Savings & Loan Association, First Federal Savings & Loan Association of Carroll, and Northwest Federal Savings & Loan Association of Spencer, Plaintiffs-Appellants,

v.

IOWA–DES MOINES NATIONAL BANK, n/k/a Norwest Bank Des Moines National Association, Defendant-Appellee.

No. 84–1875.

Court of Appeals of Iowa.

June 4, 1986.

Craig D. Warner and Robert A. Engberg of Aspelmeier, Fisch, Power, Warner & Engberg, Burlington, for plaintiffs-appellants.

Ross H. Sidney, Mark J. Weidenfeld and Patrick J. McNulty of Grefe & Sidney, Des Moines, for defendant-appellee.

Heard by DONIELSON, P.J., and SNELL and HAYDEN, JJ.

DONIELSON, Presiding Judge.

Plaintiffs, seven savings and loan institutions, appeal from an adverse final judgment granted to defendant bank by the trial court pursuant to a participation agreement entered into by the parties in connection with the extension of construction financing for a hotel project.

In 1973, the developer-borrower began seeking financing for a hotel project to be located in West Des Moines, Iowa, near Interstate 80. After an unsuccessful initial attempt to secure financing, the developer in the winter of 1974 contacted Iowa-Des Moines National Bank, n/k/a Norwest Bank Des Moines, and subsequently received a loan commitment letter. On March 28, 1974, a lender's symposium was held and attended by the developer, the defendant, and some of the plaintiffs. Shortly thereafter, the participation agreement was distributed among the parties and signed by all. In June of 1974, eleven savings and loan institutions ("participating lenders") located throughout Iowa and the Iowa-Des Moines National Bank ("lead lender") agreed to finance construction of a Hilton Hotel in West Des Moines which became known as the Country Club Hotel Project.

The lead lender asserts it agreed to lend $2.7 million dollars on the condition 90% of the amount would be participated in by others and it would retain only 10% of the loan. The lead lender contends the commitment was subject to the borrower's paying interest on construction funds advanced and contemplated the hotel would open and operate so as to pay back the principal of the loan.

Construction began in July of 1974 and the builder made payments on the interest from July through October. In November of 1974, the developer was in default. One-half of the loan amount, at this time, had been disbursed. It was not until May of 1975, however, that a second meeting of investors was called to discuss the default period from December of 1974 through March of 1975 and refinancing. In the interim period between the default and the second meeting, the lead lender paid the interest for the developer, which was not disclosed to the participating lenders.

It is the respective rights and obligations of the parties under the loan participation agreement that is in dispute among the

parties now. Basically the participating lenders contend the lead lender had the obligation to assure that adequate funding for completion of the project was secured by the developer. The developer had anticipated selling approximately $840,000 worth of limited partnerships to complete the hotel and to pay the costs for furniture, fixtures, and construction interest; however, none were ever sold. It was submitted that the hotel did not open on time due to the failure to secure this additional financing. In essence, the participating lenders contend the lead lender knew the borrower was in trouble and should have apprised them of his trouble at the earliest possible time, which it did not.

The building was 90% complete in May before the second meeting, and 90% of the loan was disbursed, or approximately $2.4 million. The developer estimated he needed $1,559,000 to complete the project. Even though the lead lender and participating lenders agreed to refinance the project, Commercial Loan Insurance Corporation (CLIC), the insurer of 20% of the mortgage, would not agree to refinancing. Thus, the lead lender and participating lenders could not refinance as desired and had to foreclose.

The lead lender brought a mortgage foreclosure action in August of 1975. The property was purchased by the lead lender in December of 1975, for $1.45 million, and ultimately sold in April of 1979. Immediately after sale, nine of the participating lenders brought this action against the lead lender to recover damages resulting from the lead lender's alleged mismanagement of the loan. Those nine participating lenders now number seven after two mergers.

In their original petition, the participating lenders pleaded various theories of relief including negligence, breach of contract, breach of warranty, and breach of trust. The trial court dismissed all divisions other than those stating a claim in negligence on the ground that the participation agreement "clearly and unambiguously reflects the intention of the parties to limit their liability to each other to losses due to negligence." Paragraph 12 of the participation agreement provided:

LIABILITY AND REPRESENTATIONS—None of the parties hereby make any express or implied warranty of any kind with respect to said Loan; and no party shall be liable to any other for any loss not due to its own negligence; but all loss or losses shall be borne proportionately by PRINCIPAL (the Bank) and PARTICIPANTS (the savings and loans) according to their respective interest in the Loan; and no party shall be responsible beyond that degree of ordinary care it would have exercised in the conduct and management of its own business.

The trial court upheld its earlier ruling in its final judgment. The court held this developer was in default on November of 1974, the participation agreement exclusively governed the rights, obligations and duties of the parties, and that absent the participation agreement, the lead lender and the participating lenders did not owe each other any duty.

The participating lenders attempted to prove the lead lender negligently breached the participation agreement by failing to disclose to them the alleged default of the developer in failing to make construction interest payments, by advancing construction interest to the developer, and by disbursing loan proceeds when it should have known the developer could not open the hotel. The court held the participating lenders had failed to carry their burden of proof on each and every one of the allegations. The court held the participating lenders failed to prove by a preponderance of the evidence that the lead lender negligently breached the participation agreement, that such negligent breach was beyond the degree of ordinary care the lead lender exercised in the conduct and management of its own business, and that such negligence was a proximate cause of any damages. The court, then, entered judgment for the lead lender.

The participating lenders contend the trial court erred: (1) in excluding evidence

offered to establish how the lead lender conducts and manages its own business in real estate lending on income producing project loans; (2) in excluding evidence offered to establish the acceptable standard of care exercised by lenders on income-producing real estate loans and that lead lender's conduct fell below that standard of care; (3) in finding the participating lenders did not carry their burden of proof that the lead lender breached the participation agreement in two major areas, and that such breaches were not negligence nor the proximate cause of the participating lenders' damages; (4) in concluding that lead lender's failure to communicate to the participating lenders the developer's default in failing to pay construction interest and the lead lender's continued disbursal of loan proceeds was neither negligent nor the proximate cause of damages to the participating lenders; (5) in finding the lead lender acted with due diligence as if it were dealing with defaults in connection with its other similar investments in trying to cure the developer's default and in finding that the lead lender does not cure a developer's default by stopping construction but rather it cures defaults by completing construction; (6) in finding that the only collateral required by the participation agreement was a mortgage; and (7) in granting summary judgment for the lead lender dismissing all divisions of the petition other than divisions stating negligent claims for relief.

## I.

Our review of this action at law is on assigned error. Iowa R.App.P. 4. The findings of fact of the trial court have the effect of a special verdict. *Id.* These findings are binding upon this court if they are supported by substantial evidence. Iowa R.App.P. 14(f)(1).

The participating lenders sought repeatedly to introduce evidence as to how the lead lender normally handled loans in an attempt to show the lead lender's actions in this instance fell below its usual standard of care because no equity financing was obtained before the loan was granted and by not disclosing the November 1974 default until March of 1975. *See* Iowa R.Evid. 401; *State v. Clay,* 213 N.W.2d 473 (Iowa 1973). The lead lender objected to such questions as irrelevant and immaterial because the participation agreement was a contract which explicitly outlined the lead lender's duties towards the participating lenders so that the lead lender's liability, if any, could only be judged in relationship to what the contract called for, not what the lead lender or other similar lending institutions had done in the past. *See* 57 Am.Jur.2d *Negligence,* § 47, at 395–97 (1971); *M & W Farm Service Co. v. Callison,* 285 N.W.2d 271, 276 (Iowa 1979). The trial court ruled that the only relevant and material inquiry was in regard to that provided in the participation agreement and was neither based upon the manner in which the lead lender usually handled loans nor upon a regional banking standard of care.

Regarding the issue of how the lead lender handled similar loans, the participating lenders sought to establish that equity financing (i.e. front money or a down payment) is typically required and that the lead lender does not typically commit 100% of the loan without any collateral or other funds provided by the borrower. Even though the participating lenders make a persuasive argument, the fact remains that neither the loan commitment letter from the lead lender to the developer dated March 27, 1974, which was fully disclosed to the participating lenders at the March 28th lending symposium, nor the participation agreement entered June 7th, required the developer to provide *any* equity financing. The loan commitment letter is silent as to such financing and paragraph 2 of the participation agreement provides, in relevant part, that "the Loan shall be evidenced by one (1) Note, which Note shall be secured by a Mortgage and such other instruments of hypothecation, collateral, insurance policies, surety bonds and other agreements as PRINCIPAL and PARTICIPANTS may reasonably require."

The participating lenders argue that equity financing would certainly be "reasonably required" under paragraph 2 of the participation agreement to secure the loan. We think participating lenders misread paragraph 2. This paragraph only requires a note, mortgage, and other instruments reasonably required. Our reading of the record indicates no other instruments were *required* by the parties. Had the participating lenders *required* equity financing and put such request in writing, or otherwise make it clear to this court that the parties agreed to equity financing, then our result may very well have been different. As it stands, the lenders knew the construction loan was to be disbursed to a shell corporation which had no other assets.

The developer, in August of 1973, obtained a loan commitment letter from Home Federal Savings and Loan for this project, but Home Federal required $700,000 in equity financing to secure the loan. Because the developer was unable to obtain such equity financing, Home Federal withdrew its commitment in January of 1974. In February of 1974, the developer contacted National Mortgage Corporation which ultimately led to the lead lender's issuing of the loan commitment letter. Regardless of whether it is uncommon to provide a loan without collateral or equity financing, this is precisely what the contract, documents, and other extrinsic evidence in the record indicates the participating lenders agreed to.

One explanation as to why the participating lenders would have entered into such an arrangement is that the lenders had a lien on the property which was appraised at $3.65 million and the loan was for $2.7 million which indicates the risk factor was 74%. Thus, upon default, the lenders would likely have enough realty to cover any loaned amounts.

Further, this developer had been involved in other real estate projects and had a proven successful investment history and apparently sufficient capital even though the money was loaned to Country Club Hotel, Inc., a shell corporation, that had no assets other than the loaned funds. The developer intended to raise $840,000 in capital to pay for fixtures, furniture, and construction interest by selling limited partnerships. No such partnerships were ever purchased which apparently led to the project failure. These partnerships were apparently to be sold within two weeks after the loan. In any event, we do not find error in the trial court's decision to exclude evidence of how the lead lender had handled similar loans for income producing real estate as it related to the period before the November default because the loan was handled according to how the parties agreed it would be handled.

■ Similarly, the participating lenders claim testimony regarding how regional lending institutions handle like loans should not have been deemed irrelevant and immaterial. The participating lenders sought to establish a regional banking standard of care for similar loans by similar lending institutions. We will not disturb the trial court's ruling as to relevancy and materiality of such evidence as it relates to the alleged negligence on the equity financing issue. However, as to the alleged negligence regarding the failure of the lead lender to timely disclose the developer's default to the participating lenders and as to the manner in which the lead lender and similar lending institutions handle problem loans, given our following discussion of the alternative theories of recovery, we think such evidence is relevant and material and should have been admitted for the limited purpose of determining the lead lender's liability, if any, *after* the November default.

## II.

The participating lenders claim the trial court erroneously determined in a ruling on a motion for partial summary judgment that the participation agreement limited litigation against the lead lender only to negligence claims, and, therefore, were not allowed to pursue their claims based on an alleged breach of contract and fiduciary

duties. We agree with the participating lenders that the trial court could have unduly limited their theories of recovery.

Paragraph 12 of the participation agreement, in part, provides "... no party shall be liable to any other for any loss not due to its own negligence." The trial court held this paragraph meant that only negligence claims could be brought against the lead lender. Iowa law provides that a contract which is clear and unambiguous is not subject to either interpretation or construction. *Vincent v. Kaser Construction Company*, 255 Iowa 1141, 1145, 125 N.W.2d 608, 610 (1963). Because the trial court's interpretation did not depend upon extrinsic evidence and because construction of a contract is always a question of law, both issues are reviewed as determinations of law in this case. *See Owen Construction Company, Inc. v. Iowa State Department of Transportation*, 274 N.W.2d 304, 306 (Iowa 1979) (citing *Connie's Construction Co. v. Fireman's Fund Insurance Co.*, 227 N.W.2d 207, 210 (Iowa 1975). We find that the intention of the parties is not clear and unambiguous because a fair reading of paragraph 12 indicates it could mean that if a negligent act occurs, a party will only be liable for *its* negligence. *See* Iowa R.App.P. 14(f)(14). Given this meaning, theories based on breach of contract or breach of fiduciary duty would not be precluded by paragraph 12.

This paragraph is distinguishable from the contract clause in *Owen Construction* because paragraph 12 does not clearly and unambiguously state that the lead lender could only be sued on negligence *claims*. *Cf. Owen Construction*, 274 N.W.2d at 305 (Contract expressly limited defendant's liability to "only when such damages result from negligence on part of [defendant].''). Thus, it does not clearly and unambiguously limit the theories of recovery so that only negligence claims can be brought against the lead lender. *Accord* 5 *Banking Law* § 102.06 (1985) ("The lead bank issues a participation certificate that contains the terms of the participants' rights. The participation certificate evidences each participant's pro rata interest in the loan and any collateral. It usually contains a disclaimer of liability on the part of the lead bank if the borrower defaults; it warrants the genuineness of documents that may be given to participants, but it also limits the liability of the lead bank to liability arising from its management of the loan."); *see also* Simpson, *Loan Participations: Pitfalls for Participants*, 31 Bus.Law 1977, 2019–21 (1976). Paragraph 12 can reasonably be construed as stating that if the lead lender is sued for negligence, it can only be liable for its own negligence. Given this interpretation, paragraph 12 would be silent as to the alternative theories of recovery not based on negligence.

◼ The trial court should have applied the rules of interpretation and construction because paragraph 12 did not have a clear and unambiguous meaning. *But see Cunningham Bros., Inc. v. City of Waterloo*, 254 Iowa 659, 668, 117 N.W.2d 46, 51 (1962). We do agree with the lead lender, however, that no claim can be brought against it for a breach of an implied or express warranty based on the fact that the first sentence of paragraph 12 does have a clear and unambiguous meaning. We, therefore, decide the meaning of paragraph 12 needs to be ascertained to determine if the participating lenders could sue the lead lender on theories other than those based on negligence. We note that suits based on breach of contract and breach of fiduciary duties are typical in this area of litigation. *See Capitol Savings & Loan Association, Inc. v. First Financial Savings & Loan Association, Inc.*, 364 N.W.2d 267, 271–72 (Iowa Ct.App.1984); *see also Carondelet Savings & Loan Association v. Citizens Savings & Loan Association*, 604 F.2d 464, 468 (7th Cir.1979) (lead lender's loan to borrower was within terms of participation agreement even though participating lender did not agree); *First Pennsylvania Mortgage Trust v. Dorchester Savings Bank*, 395 Mass. 614, 618, 481 N.E.2d 1132, 1135 (1985) (dispute between participating and lead lenders over agreement to refinance borrower). We express

no opinion as to how paragraph 12 should be interpreted or construed, so that the court on remand can make its own findings and conclusions on this and related issues.

We also find deficiencies in one aspect of the trial court's handling of the proximate cause issue. The trial court found that because the participating lenders were willing to refinance the project in May of 1975, had they been notified of the default in November of 1974, they would not have decided to foreclose at that time either. This determination is not necessarily true as a matter of law. The law in Iowa provides:

> An act or omission is a "proximate cause" when the actor's conduct is a substantial factor in bringing about the condition, and when it appears that if it had not been for such act or omission the condition would not have been brought about. "Substantial" means that a defendant's conduct has such an effect in producing the harm as to lead a reasonable person to regard it as a cause.

*See* Iowa Uniform Jury Instructions No. 2.6; *Pedersen v. Kuhr*, 201 N.W.2d 711, 713 (Iowa 1972); *Federated Mutual Implement & Hardware Insurance Co. v. Dunkelberger*, 172 N.W.2d 137, 144 (Iowa 1969).

Even though the participating lenders' decision not to foreclose in May of 1975, is somewhat probative of how they may have reacted to knowledge of the default in November of 1974, we cannot find they failed to show proximate cause. By December of 1974, approximately $1.3 million of the $2.7 million loan had been disbursed to the developer; accordingly, $1.4 million had not been loaned. Had the participating lenders been informed of the default by the lead lender in November of 1974, they very well may have decided not to loan the remaining $1.4 million, so as to mitigate their losses and foreclose on the project. While foreclosure in November of 1974 may have been unlikely because the project was only fifty percent complete, we still find failure to disclose the default could have been the proximate cause of subsequently disburs-

ing the remaining $1.4 million. The developer's inability to sell $840,000 worth of limited partnerships could have caused the *developer* to default, however, that is a separate issue from the proximate cause of the decision of the lenders to advance funds to pay the requisite interest payments, resulting in disbursement of the remaining $1.4 million.

Provided a breach of contract theory is allowed, the lead lender's failure to communicate the developer's failure to make his monthly interest payment could have breached the terms of paragraph 13 of the participation agreement. This paragraph provided:

> PROCEDURE UPON DEFAULT—If any event of default comes to the knowledge of any party hereto, such party shall give prompt notice of the existence and nature of such default to the others; and PRINCIPAL shall, with due diligence to the extent PRINCIPAL would act in dealing with defaults in connection with PRINCIPAL'S other similar investments, cause such default to be cured; provided, that PRINCIPAL shall not accelerate the Note nor proceed at law or in equity to enforce payment or performance without advising PARTICIPANTS of its intention so to do in writing and securing PARTICIPANTS' written consent to such proposed action.

The lead lender's decision not to notify the participating lender of the developer's failure to make payment in November and its subsequent financial arrangement with the developer may have breached this provision of the participation agreement.

We do, however, find no merit in the participating lenders' position that proximate cause was established on the equity financing issue. As mentioned, all the lenders agreed to provide funds to the borrower without requiring equity financing. Thus, the lead lender could not be liable for any damages in this regard. The initial disbursements of approximately $1.3 million to facilitate construction did not involve any actionable behavior on the lead lender's behalf. Finally, given our disposi-

tion on the proximate cause issue, we do not address the due diligence findings.

We find a new trial is appropriate and is limited to the following matters: Did paragraph 12 mean that the parties could only sue each other on negligence claims? If paragraph 12 is interpreted or construed so as not to preclude recovery based on theories other than negligence, then did the lead lender breach the contract or breach a fiduciary duty by failing to disclose to the participating lender until March of 1975 that the developer defaulted in November of 1974? If paragraph 12 is interpreted or construed so that only negligence claims can be brought against the lead lender, then did the lead lender act negligently by failing to disclose to the participating lenders until March of 1975 that the developer defaulted in November of 1974? The lead lender's liability for damages, if any, is limited to damages arising from any disbursements made after November of 1974. Whether the participating lenders would have, nonetheless, approved of disbursing the remaining funds even if they were informed of the default before March of 1975 relates to proximate cause on the negligence theory and relates to the speculativeness of damages on the breach of contract and breach of fiduciary duty theories. To this end, testimony regarding the practice in the banking community generally and of the lead lender specifically is relevant and material.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

HAYDEN, J., concurs.
SNELL, J., concurs in result only.